Mary **POE** and Harold R. Hoke, M. D., and all others similarly situated, Plaintiffs,

v.

**CHARLOTTE MEMORIAL HOSPITAL, INC., et al., Defendants.**

No. C–C–74–44.

United States District Court, W. D. North Carolina, Charlotte Division.

April 9, 1974.

Roy Lucas, Washington, D. C., Chambers, Stein, Ferguson & Lanning, Charlotte, N. C., for plaintiffs.

John G. Golding and Rodney A. Dean, Carpenter, Golding, Crews & Meekins, Charlotte, N. C., for defendants.

## OPINION AND ORDER

McMILLAN, District Judge.

### PRELIMINARY STATEMENT

This case was heard in Charlotte on March 11, 1974, upon the petition of plaintiffs for an order restraining defendants from denying to Dr. Harold R. Hoke the continuation, pending final decision of this case on the merits, of his surgical staff privileges at Charlotte Memorial Hospital.

### THE PARTIES

The plaintiff, Harold R. Hoke, is a duly licensed physician and surgeon, a resident and citizen of North Carolina, a specialist in obstetrics and gynecology, a graduate in medicine from the Bowman-Gray Medical School. He has his office in Charlotte.

The plaintiff Mary Poe (Mary Poe is a pseudonym) is a twenty-three-year-old Charlotte resident, a patient of Dr. Hoke, who is pregnant and seeks a therapeutic abortion to be performed at the defendant Charlotte Memorial Hospital. She seeks to sue for herself and others similarly situated. Her case requires hospitalization and she seeks an order compelling defendants to provide it for her as a patient of Dr. Hoke.

The defendants are the Charlotte Memorial Hospital, Inc., its executive director, medical staff, other doctors, and others who operate Memorial Hospital and its committees, and determine who is allowed to practice medicine and surgery in the hospital.

The hospital Authority is a public corporation; it has received large sums of money from state and federal governments, including an amount alleged to be over $7,000,000.00 under the Hill-Burton Act; and in 1973 it received sums alleged to be greater than $9,000,000.00 in Medicaid and Medicare payments.

The hospital serves a public function, and the actions of the hospital and of the defendants who manage it, staff it and serve on its governing committees are state action "under color of any State law, statute, ordinance, regulation, custom or usage" under Title 28, United States Code, § 1343. Defendants have authority under Section 131–98 et seq. of the General Statutes of North Carolina "to determine and regulate the conditions under which the privilege of practicing within any hospital operated by the Authority may be available to physicians. . . . " and "to make rules and regulations governing the admission of patients to, and the care, conduct, and treatment of patients in, the hospital . . . ."

The question presented is not a medical question but a constitutional question: Whether, in the administration of their public duties of determining who practices medicine and surgery in the hospital, the defendants have observed the due process or procedural fairness requirements of the Constitution of the United States.

### THE CLAIMS

The plaintiff Poe, for herself and others, claims that she has been unlawfully denied the personal right to be hospitalized for her abortion at the hands of the doctor of her choice, Dr. Harold R. Hoke. She alleges that she has been deprived of equal protection of laws and due process of law by alleged arbitrary and summary suspension of Dr. Hoke's staff privileges and that she has been deprived of her personal freedom of selection of her own physician and of her right of privacy by alleged arbitrary actions of the defendants.

Dr. Hoke claims that his privileges to admit patients into Memorial Hospital and to treat them there were suspended arbitrarily, without valid professional, medical or other cause, and that he was thus denied equal protection of laws. In the present stage of the proceedings, this particular claim is not before me

for consideration; I will not, at least for now, undertake to decide whether there were or were not valid medical reasons for the suspension and non-renewal of plaintiff's staff privileges.

Dr. Hoke also claims, however, that the *method* or manner in which defendants acted was arbitrary and unfair; that he was deprived of his privileges without knowledge or notice of the charges against him, without a hearing or an opportunity to be heard, and that this procedure deprived him of equal protection of laws and of due process of law. This is the claim that must be dealt with now.

(One original issue between the parties has already been dealt with for the time being by Judge Frank Dupree in the Eastern District of North Carolina. Judge Dupree has directed the convening of a three-judge court and pending decision of that court he has restrained the State of North Carolina from enforcing the provisions of their September 1973 rules which require that an abortion clinic have a "transfer agreement" with a local hospital plus emergency transportation to assure the patient access to hospital care within fifteen minutes. That issue will be finally decided later by the three-judge court. Attention is called to Judge Dupree's order in that case, Harold R. Hoke, et al., Plaintiffs, v. North Carolina Department of Human Resources, et al., Defendants, Civil No. 74–27–Civ.–5, filed February 19, 1974.)

## OUTLINE OF THE ESSENTIAL FACTS

For nearly two years, from February 1972 until December 19, 1973, Dr. Hoke had the privileges of a visiting staff physician at Charlotte Memorial Hospital. He had approximately eleven patients admitted during that time for obstetrical or gynecological surgery or treatment. The dates of those admissions and the patients' chart numbers are as follows:

| DATES OF ADMISSIONS | CHART NUMBERS |
|---|---|
| February 15, 1972 and May 14, 1972 | 32–31–33 |
| March 3, 1972 | 42–93–28 |
| March 9, 1972 | 29–89–07 |
| March 19, 1972 and November 27, 1972 | 42–86–01 |
| June 2, 1972 | 43–38–44 |
| August 30, 1972 | 43–82–53 |
| September 5, 1972 | 43–84–29 |
| December 26, 1972 | 30–59–47 |
| January 1, 1973 | 28–80–16 |
| January 11, 1973 | 44–39–41 |
| November 19, 1973 | 45–82–62 |

These charts had been subject to the usual routine peer review under existing hospital procedures, and two of them had been discussed in staff sessions, but no reprimand or critical action had been taken.

In August of 1972 Dr. Hoke filed suit against the Presbyterian Hospital of Charlotte, alleging untoward and unjustified delay in admitting him to staff privileges at Presbyterian Hospital. That case is still pending and scheduled for trial in the near future on remaining issues.

Dr. Hoke was not constantly engaged in medical practice in Charlotte throughout 1973. In January of 1973 he left Charlotte and moved to Georgia, and there were no admissions by him to Memorial Hospital between the 11th day of January, 1973, and the 19th day of November, 1973.

On January 22, 1973, the Supreme Court decided the cases of Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147, and Doe v. Bolton, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201, upholding the right of pregnant women under certain restrictions to have abortions.

In November of 1973, Dr. Hoke returned to Charlotte and with considerable fanfare and publicity opened up the Hallmark Clinic and Counselling Service at 316 East Morehead Street (a few blocks from Memorial Hospital), as apparently the first certified non-hospital abortion clinic in the state.

When he opened up the abortion clinic Dr. Hoke was still a member of the surgical staff at Memorial Hospital.

Dr. Hoke is not by nature a peacemaker. He has sued hospitals and other people and he has been sued for alleged malpractice and other things; he has had sharp words in the past with other doctors including some of those who now would exclude him from Memorial Hospital; and his controversies have made newspaper headlines. Neither he nor the defendants in this case seem to have had any aversion to publicity so long as it is favorable. The case and the activities of Dr. Hoke have been widely reported in the newspapers and broadcast media.

November is the time when Memorial Hospital staff privileges come up for renewal. In November of 1973 the Credentials Committee of Memorial Hospital met and as a routine matter approved the renewal of the credentials of all the doctors on the staff except Dr. Hoke. Action on his re-appointment was postponed upon request of the Chairman of the Department of Obstetrics and Gynecology. The Chairman of that department then examined the charts on the eleven patients Dr. Hoke had admitted to the hospital, and made a recommendation to the committee that Dr. Hoke's staff appointment be terminated and that he not be reappointed for 1974. This recommendation was then joined in by the Executive Committee of the Department of Obstetrics and Gynecology in a meeting on December 3, 1973, at which the patients' charts were reviewed. This recommendation was transmitted to the Credentials Committee and to the Executive Committee.

The Credentials Committee met on the 4th day of December, 1973, and recommended to the Executive Committee that Dr. Hoke's staff privileges be terminated.

The Executive Committee met on December 12, 1973, and adopted the resolution of the Credentials Committee. At this Executive Committee meeting the various charts were discussed by the chief and the associate chief of the Department of Obstetrics and Gynecology and then the Executive Committee voted to adopt the recommendations of the Credentials Committee.

At this December 12, 1973 meeting of the Executive Committee a resolution was adopted for transmission to the Board of Managers providing that if a practitioner affected by an adverse decision sought a hearing,

". . . neither the affected practitioner nor the executive committee of the medical staff or the governing body shall be represented at any phase of the hearing procedure by an attorney at law unless the hearing committee in its discretion permits both sides to be represented by counsel . . . ."

On December 19, 1973, the Board of Managers met and received a report of the December 12 resolution of the Executive Committee. They adopted the action recommended, and issued a letter on December 19 notifying Dr. Hoke that "your privileges as a member of the Courtesy Staff, Visiting Medical Staff, of Charlotte Memorial Hospital are terminated effective immediately."

At the same meeting the Board of Managers adopted the anti-lawyer resolution of the Executive Committee.

So far as appears from the available records, all of the proceedings until the December 19, 1973, letter had been conducted in total secrecy as far as Dr. Hoke was concerned, and without notice or knowledge to him and without any opportunity whatever to be heard.

According to the plaintiff, most of his hospital practice throughout his stay in Charlotte had been conducted at Mercy Hospital (which was, during that period, a leading hospital in the field of obstetrics and gynecology, but which has recently announced discontinuance of its obstetrical department).

On December 26, 1973, and on January 2, 1974, plaintiff through counsel wrote requesting information about the

charges, a delay in the suspension, a renewal of Hoke's privileges, and a hearing.

On January 11, 1974, the defendants wrote the plaintiff that a committee had been appointed to conduct a hearing and attached a lengthy list of generalized complaints about Hoke's procedures and practices.

The committee which was appointed to conduct this hearing is known as an Ad Hoc Committee. That committee conducted a hearing with counsel present on February 6, 1974. The proceedings were recorded by a court reporter, but are not yet available. The decision of the committee was as follows:

*"This Committee,* without expressing any opinion as to whether the evidence before the Executive Committee did or did not support the action taken by the Executive Committee, *recommends that the action taken by the Executive Committee be modified to allow Dr. Hoke probational Courtesy Staff privileges subject, however, to continuous peer review and subject also* to the By-Laws, Rules, Regulations and Governing Bodies of the Visiting Medical Staff and Charlotte Memorial Hospital." (Emphasis added.)

(Plaintiff and his counsel contend they did not know the contents of this February 6, 1974 recommendation until the hearing in this court on March 11, 1974.)

Thereafter, on March 6, 1974, the Executive Committee of the visiting medical staff met and considered the recommendation of the Ad Hoc Committee and heard further comments from the prosecuting doctors and adopted a resolution continuing the suspension and the refusal to renew, pending further investigation. Among the items listed as reasons for the action were:

"WHEREAS, this Committee has received and heard the report of the Ad Hoc Committee concerning its investigation and hearing on the lack of renewal of staff privileges and suspension of staff privileges of Dr. Harold R. Hoke but has not received the transcript of the proceedings in evidence presented before the Committee until the time of this meeting due to the length of the hearing and the delay caused in transcribing the testimony due to the illness of the court reporter, Rebecca D. Moore, and this Committee has not had an opportunity to review the transcript, and whereas it appears from the report of the Ad Hoc Committee that the Committee's report did not contain any specific finding as to whether or not the charges or grounds presented to it at the hearing lacked any factual basis or whether the basis or action based on it was arbitrary, unreasonable, or capricious, and did not recommend complete restoration of staff privileges but instead recommended closely supervised probation for Dr. Hoke,

"And whereas only charts involving admissions of patients by Dr. Hoke to Charlotte Memorial Hospital prior to November 19, 1973, were presented to or reviewed by the Ad Hoc Committee and this Executive Committee has received information and opinions that there were some seven additional admissions of patients by Dr. Hoke to this hospital after November, 1973, which were not previously considered by this Committee or presented to the Ad Hoc Committee but which show or may show failure on the part of Dr. Hoke to meet the minimum standards of care for patients in Charlotte Memorial Hospital, and whereas this Committee has also received information that there is a malpractice suit pending in the State of Georgia against Dr. Harold R. Hoke by a patient seeking damages based on allegations she was injured by negligence and improper treatment of Dr. Harold R. Hoke while in Sam Howell Memorial Hospital, that the staff privileges of Dr. Hoke at the hospital were suspended following such treatment, and that there are outstanding criminal

charges against Dr. Harold R. Hoke in the State of Georgia, that a malpractice suit is currently pending in Mecklenburg County, North Carolina, against Dr. Harold R. Hoke by a former patient of Dr. Hoke seeking damages for alleged negligence occurring during an operation by Dr. Hoke at Presbyterian Hospital, that reports and information of at least one instance of alleged improper treatment of a patient at Mercy Hospital by Dr. Hoke have been received by members of this Committee but have not yet been investigated or substantiated, that information has been developed and is being developed concerning improper, inadequate, and sub-standard treatment of patients by Dr. Hoke at the Hallmark Clinic operated by him in Charlotte, North Carolina, including reports of possible injury to patients from such treatment, and that there have been further reports brought to the attention of this Committee of instances involving allegedly false charges made by Dr. Hoke against fellow physicians in North Carolina and Georgia and other information raising grave doubts as to whether Dr. Hoke possesses the unquestioned professional and moral integrity required as a prerequisite for membership on the staff at Charlotte Memorial Hospital under Article III, Section 2, of the By-Laws of the hospital, . . . ."

A hearing on plaintiff's request for restoration of his privileges pending the litigation was conducted in this court on March 11, 1974. At that hearing and subsequently, the file has been loaded with affidavits and briefs and contentions on behalf of the parties and a lot of opinions by doctors, pro and con, have been filed at and subsequent to the hearing. This court claims no expertise in obstetrical and gynecological procedures and will not at any time be the agency to decide whether the suspension and removal of Dr. Hoke was or might have been medically justified by the evidence before the hospital staff. In passing, however, it may be worth noting that in addition to the unfavorable opinions, there is evidence favorable to Dr. Hoke, including the following:

(a) The Memorial Hospital Ad Hoc Committee of doctors recommended continuation of Hoke's hospital privileges, "subject, however, to continuous peer review and subject also to the By-Laws, Rules, Regulations and Governing Bodies of the Visiting Medical Staff and Charlotte Memorial Hospital."

(b) Dr. Joseph H. Pratt, senior gynecological surgeon of the Mayo Clinic at Rochester, Minnesota, a graduate of the University of North Carolina and of the Harvard Medical School (1937), and one other member of his Mayo Clinic staff reviewed the evidence which had been presented to the committee which first recommended suspension, and reported that the standard of care and treatment and attention revealed by the files was in accordance with prevailing standards of practice, including the practice at the Mayo Clinic.

(c) Dr. Jane E. Hodgson, a practicing obstetrician and gynecologist in Washington, D. C., a graduate of the University of Minnesota, a former fellow at Mayo Clinic and a Diplomate and Voting Fellow of the American College of Obstetrics and Gynecology, testified that she found nothing in the records to justify suspension of Dr. Hoke.

(d) Dr. Allen J. Margolis, Professor of Obstetrics and Gynecology at the University of California Medical Center in San Francisco, reviewed the charts and expressed the opinion that the drug therapy under question and the other actions of Dr. Hoke demonstrated standard and acceptable specialist care at urban teaching institutions and that the charts did not provide any basis for withdrawal of hospital privileges.

(e) Dr. Lonnie S. Burnette, Associate Professor since 1964 of Obstet-

rics and Gynecology at Johns Hopkins School of Medicine, also a Fellow of the American College of Obstetrics and Gynecology and a graduate of the University of Texas Medical School, reviewed the charts, that is, the evidence before the original committee, and found nothing in them which would suggest that the physician's hospital privileges should be suspended.

What would be the decision of a group of doctors neither emotionally nor professionally involved in the issue has not yet been determined. The cautious attitude of the Ad Hoc Committee which recommended continuation of Dr. Hoke's privileges under "continuous peer review" may be some indication.

Article III, Section 5, of the By-Laws speaks of notice and hearing. It reads as follows:

"Section 5. Appeals

"Any physician receiving an unfavorable action on an application for appointment, consideration for annual reappointment, or any act that adversely affects a change in status or in clinical privileges by an authoritative body of the Hospital shall be notified by the Director. The physician may request a hearing under appeals mechanism set forth in Appendix I attached to these By-Laws."

The Appendix I referred to in Section 5 is entitled "HEARING AND APPELLATE REVIEW PROCEDURE." Section 1 of Appendix I, Article III, Section 5, is entitled "Right to Hearing and to Appellate Review," and provides as follows:

"A. *When any practitioner receives notice of a recommendation of the Executive Committee that,* if ratified by decision of the Board of Managers, *will adversely affect his* appointment to or *status* as a member of the Medical Staff or his exercise of clinical privileges, *he shall be entitled to a hearing before an ad hoc committee of the Medical Staff.* If

the recommendation of the Executive Committee following such hearing is still adverse to the affected practitioner, he shall then be entitled to an appellate review by the Board of Managers before the Board of Managers makes a final decision on the matter.

"B. When any practitioner receives notice of a decision by the Board of Managers that will affect his appointment to or status as a member of the Medical Staff or his exercise of clinical privileges, and such decision is *not based on a prior adverse recommendation by the Executive Committee* of the Medical Staff with respect to which he was entitled to a hearing and appellate review, he shall be entitled to a hearing by a committee appointed by the Board of Managers, and if such hearing does not result in a favorable recommendation, to an appellate review by the Board of Managers, before the Board of Managers makes a final decision on the matter." (Emphasis added.)

The by-laws unfortunately provided Hoke no chance to be heard *before* he had been excluded from the hospital staff. Although they speak of notice, they do not require that *advance* notice of the charges be given the practitioner before the Executive Committee considers his case. Hoke in fact was not given *subsequent* notice of the adverse Executive Committee recommendation; his first knowledge came several weeks later when he was notified that he had been excluded from the staff. The event—*receipt of notice* of an adverse recommendation of the Executive Committee—which under these rules might have triggered a hearing before an Ad Hoc Committee of the Medical Staff before the question reached the Board of Managers, never took place.

The Ad Hoc Committee was in fact not convened before the Executive Com-

mittee recommendation had been presented to and adopted by the Board of Managers. The Ad Hoc Committee's views therefore were not available to the Board of Managers until after they had made and executed a judgment in the case.

When the matter reached the Board of Managers the Executive Committee was required by the by-laws (Appendix I, Article III, Section 5F) to become the prosecuting agency before the Board of Managers. Section 5F reads as follows:

> "F. The Executive Committee, when its action has prompted the hearing, shall appoint one of its members or some other Medical Staff member *to represent it at the hearing, to present the facts in support of its adverse recommendation,* and to examine witnesses. The Board of Managers, when its action has prompted the hearing, shall appoint one of its members to represent it at the hearing, to present the facts in support of its adverse decision and to examine witnesses. It shall be the obligation of such representative to present appropriate evidence in support of the adverse recommendation or decision, but the *affected practitioner shall thereafter be responsible for supporting his challenge to the adverse recommendation or decision by an appropriate showing that the charges or grounds involved lack any factual basis or that such basis or any action based thereon is either arbitrary, unreasonable or capricious.*" (Emphasis added.)

Since the Executive Committee was required by the by-laws to become the prosecuting agency before the Board of Managers, it could not reasonably have been expected of its members that they maintain an impartial stance in any later proceedings.

It is also of great significance that Section 5F places upon the accused prac-

titioner, who has never yet had a hearing nor an opportunity to be heard, the burden of proving that the charges against him "lack any factual basis or that such basis or any action based thereon is either arbitrary, unreasonable or capricious."

In other words, under these by-laws the Executive Committee and the Board of Managers are expected to put the burden upon the accused of proving his innocence of whatever he might at the hearing discover the charges to be!

Emergency as a basis for postponing fairness is not demonstrated. There may well be circumstances in which temporary suspension for brief periods without notice or hearing might be justified. Considerations of health and patient welfare are of great importance to the public at large as well as to the doctors themselves. No emergency was revealed, however, by the facts before the court. The charts on the basis of which the original suspension was ordered date back to February 1972. They had been subject to routine review. Some of them in fact had been so reviewed. Several weeks elapsed between the postponement of decision on Dr. Hoke's renewal, at the request of the chief of the Obstetrical Department, and the final action by the Board of Managers. That is plenty of time to notify the accused doctor and hear his defense and make a reasoned decision based upon hearing both sides of the charges.

### DUE PROCESS OF LAW

■■ The defendants are exercising the power of the state when they admit, suspend or expel licensed doctors from the Memorial Hospital staff. In such role they are bound by the requirements of the United States Constitution. This means that, genuine emergency aside, they may not expel a staff doctor from staff privileges without due process of law. Due process normally requires that they give advance notice of the charges in sufficient detail to permit intelligent response, and allow the accused doctor full *opportunity* to *appear and be heard,*

to question and cross-examine adverse witnesses and accusers, to challenge the accusations of wrong doing, and to present evidence in his own behalf.

■ A necessary element in due process is that the opportunity to defend must be given *at a time when it can be effective.* Unless the defense can speak *at a time when there is a chance to be heard fairly,* the opportunity to speak is a hollow one.

■ Due process, in simple terms, means fair procedure.

Due process of law is not an American invention. It seems to have been a trademark of civilization for thousands of years. By the age of Pericles (5th Century B.C.), the concept of fair hearing seems to have been accepted; the chorus in Aristophanes' play, *"The Wasps,"* chanted that

> "T'was a very acute and intelligent man, whoever it was, that happened to say,
>
> Don't make up your mind till you've heard both sides."

When the Apostle Paul was put on trial in the first century A.D. before Festus, that Roman governor refused to proceed against him without a hearing, reporting to King Agrippa that

> "It was not the custom of the Romans to give up anyone before the accused met the accusers face to face and had opportunity to make his defense concerning the charge laid against him." New Testament, Acts of the Apostles, Chapter 25, Verse 16.

The Fourteenth Amendment to the United States Constitution, which applies to actions of those exercising the power of the state, requires that no person be deprived of life, liberty, or property without "due process of law." Our definition of due process has been worked out by courts through the two centuries since the Republic was founded. There are some fuzzy edges in the definition, just as there are in many statements of public duty; and the strictness of due process requirements may be affected by the nature of the case; but the basic principles are clear. In the case of Groppi v. Leslie, 404 U.S. 496, 502–503, 92 S.Ct. 582, 586, 30 L. Ed.2d 632 (1972), Chief Justice Burger expressed it this way:

> " . . . Indeed, we have stated time and again that reasonable notice of a charge and an opportunity to be heard in defense before punishment is imposed are 'basic in our system of jurisprudence.' In re Oliver, 333 U.S. 257, 273 [68 S.Ct. 499, 507, 92 L.Ed. 682] (1948). See, *e. g.,* Joint Anti-Fascist Refugee Committee v. Mc-Grath, 341 U.S. 123, 143, 164–165, 171–172, 178, 185 [71 S.Ct. 624, at 633, 644–645, 648–649, 652, 655, 95 L.Ed. 817] (1951) (concurring opinions of Black, Frankfurter, Douglas, and Jackson, JJ.); Cole v. Arkansas, 333 U.S. 196, 201 [68 S.Ct. 514, 517, 92 L.Ed. 644] (1948). We have emphasized this fundamental principle where rights of less standing than personal liberty were at stake. *E. g.,* Sniadach v. Family Finance Corp., 395 U.S. 337 [89 S.Ct. 1820, 23 L.Ed.2d 349] (1969); Morgan v. United States, 304 U.S. 1, 18 [58 S.Ct. 773, 776, 999, 82 L.Ed. 1129] (1938); Grannis v. Ordean, 234 U.S. 385, 394 [34 S.Ct. 779, 783, 58 L.Ed. 1363] (1914). In Mullane v. Central Hanover Trust Co., 339 U.S. 306 [70 S.Ct. 652, 94 L.Ed. 865] (1950), the Court stated:

> " 'Many controversies have raged about the cryptic and abstract words of the Due Process Clause but there can be no doubt that at a minimum they require that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case.' 339 U.S., at 313 [70 S.Ct., at 656]."

Huntley v. N. C. State Board of Education, et al., Fourth Circuit 493 F.2d 1016 (1974) reiterates the due process principle that notice must be given at a time when it can actually be meaningful. Huntley condemned the action of the North Carolina State Board of Educa-

tion in affirming the withdrawal without notice of a school teacher's teaching certificate (notwithstanding the fact that defendants had later conducted a hearing at which the school teacher had been given the burden of proving the invalidation unwarranted).

■ It is obvious from the record that Dr. Hoke's loss of staff privileges at Memorial Hospital in Charlotte is loss of a valuable property.

■ It is not necessary to find bad faith on the part of the defendants. "Bad faith" is a polar term which generally partakes more of name calling than of legal standard. The defendants, not the court, are the doctors; and no doubt their actions are believed by them to be for the good of the professional order and, more importantly, for the good of the public and the particular patients who are or may be involved.

Nor are unconstitutional actions justified simply because of *good* faith. Due process—fair procedure—is not a bitter medicine which is reserved only for the knowingly wicked. Due process is a simple necessity of any society which believes (as did those who drew our Constitution) that the excesses of governmental power are more dangerous than the risks of personal freedom. Power tends to corrupt us all—even the "good guys"—and due process of law—the command to hear both sides before deciding—is a necessary restraint on the exercise of governmental power.

Plaintiff demonstrates that he has been seriously damaged by loss of his hospital staff privileges and that this damage is great, irreparable and immediate.

One prime function of equity, in cases like this, is to try to maintain or return to the status quo, when possible, until final conclusion of the litigation. The Ad Hoc Committee's recommendation suggests how this can practicably be done without likely prejudice to anyone.

■ These findings and conclusions are for purposes of this order only and on this record only, and are of course not binding on any of the parties or the court or any later jury or other finder of fact.

A moderate bond should be required of plaintiff.

No separate facts are found nor rulings made regarding the claims of Mary Poe; such temporary relief as the court can afford her can result indirectly from this order, and no rulings are made now on her class action claims.

■ Defendants, exercising the power of the state, have deprived plaintiff Hoke of a valuable property right without due process of law, thereby inflicting great, irreparable and immediate harm. Pending final decision on the merits, he should be reinstated on the hospital staff, with qualifications and conditions as hereafter ordered.

Jurisdiction exists in this court under 28 U.S.C. §§ 1331, 1343 and 2201.

### ORDER

Pending further orders of court:

1. Defendants are restrained from keeping in effect their denial of staff privileges to plaintiff Dr. Hoke, and they are directed to re-admit him and, as recommended by the Ad Hoc Committee, allow him probational Courtesy Staff privileges, subject, however, to continuous peer review and subject also to the By-Laws, Rules, Regulations and Governing Bodies of the Visiting Medical Staff and Charlotte Memorial Hospital.

2. Plaintiff will, as a condition precedent to the validity of this restraint, post a cash bond or a secured bond of $2,500.00 to secure defendants from loss or damage in the event it should finally be determined that this order was erroneously or improvidently entered.

3. The parties will discontinue all discovery and other hearings except those being conducted on April 9 and 10, 1974.

4. Counsel will confer and endeavor to agree if possible on some procedure by which the question of Dr. Hoke's staff status may be determined on the merits by a proper or an agreed tribunal, and by procedures of due process of law, and report to the court in writing by May 1, 1974, on the state of their conversations.

5. Plaintiff Hoke is reminded that this order is temporary only and that it deals only with the constitutionality of the *procedures* discussed above.