JACKSONVILLE MARITIME ASSOCIA-TION, INC., a Florida Corporation, et al., Plaintiffs,

v.

INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, LOCAL NO. 1408–A, a labor organization, and as an unincorporated association, by and through Landon Williams, its President, or its other officers, business agent, manager or person in charge, Defendant.

No. 76–749 Civ–J–S.

United States District Court, M. D. Florida, Jacksonville Division.

Dec. 10, 1976.

Gary A. Bubb, Jacksonville, Fla., for plaintiffs.

Lacy Mahon, Jr., Jacksonville, Fla., for defendant.

## OPINION AND PRELIMINARY INJUNCTION

CHARLES R. SCOTT, District Judge.

This cause is before the Court on plaintiffs' motion for a preliminary injunction.

The Court's jurisdiction is invoked under 29 U.S.C. § 185 (Section 301 of the Labor Management Relations Act, hereafter 'LMRA'). The Jacksonville Maritime Association, Inc. ('JMA') is an employer for the purposes of 29 U.S.C. § 152(2) (Supp.1975) and Section 185(a); and its member-employees are bound by the collective bargaining agreement between JMA and Local 1408–A, International Longshoremen's Association. *Paul v. Lindgren,* 375 F.Supp. 843, 850–851 (N.D.Ill.1974); *Local 415, International Ladies Garment Worker's Union AFL–CIO v. Miami Casuals, Inc.,* Case No. 70–90 Civ–Ec, April 8, 1971, S.D.Fla.), *aff'd* 456 F.2d 799 (5th Cir. 1972); *Farina Bros. Co. v. Local 107, United Brotherhood of Carpenters and Joiners of America,* 152 F.Supp. 423, 424–425 (D.Mass.1957). Local 1408–A, International Longshoremen's Association is a labor organization whose members are employees of an employer engaged in interstate commerce for the purpose of 29 U.S.C. § 152(5) and Section 185(b). As a basis for its issuance of the preliminary injunction, the Court finds the facts and declares the pertinent principles of law as follow:

## FINDINGS OF FACT

The first plaintiff, JMA, is a Florida corporation and a multi-employer collective bargaining association with its principal place of business in Jacksonville, Florida. Its principal purpose is to represent its member-employers in collective bargaining negotiations with unions employed in the maritime industry in Jacksonville, Florida. The second and third plaintiffs in this action are the Jacksonville Port Authority ('JPA') and Eller & Company ('Eller'). JPA and Eller are members of JMA. JPA and Eller are operators of marine warehouses at the Jacksonville Port. JPA owns two warehouses adjacent to the docks at Blount Island Terminal in Jacksonville. Incoming and outgoing cargo is handled at those warehouses, either before loading ships for delivery, or after unloading ships upon arrival and receipt of shipments. The first defendant, Local 1408–A, International Longshoremen's Association, is an unincorporated labor organization whose members are employees of JPA and Eller (as well as other employer-members of JMA). Local 1408–A ('the Union') has its principal place of business in Jacksonville, Florida. The second defendant, Landon Williams, is President of the Union. The Union is the certified bargaining representative for its members who are workers in the shipping and warehousing industry. The Union represents its members over wages, hours, and other terms and conditions of employment affected by the collective bargaining process. Those members are not stevedores, because they do not directly load or unload ships, but instead handle cargo coming in and going out of warehouses only. The Union operates a hiring hall in Jacksonville, under a procedure whereby its members report daily to fill hiring orders sent by the employer-members of JMA, to work in the warehouses. JPA and Eller daily receive their workers through the Union's hiring hall. This procedure is provided by the current collective bargaining contract existing between the Union and JMA. That contract, which became effective on August 8, 1974, will expire on September 30, 1977.

The parts of the collective bargaining contract between the Union and JMA that are germane to the dispute at issue in this case are set forth as follows:

7–A. It is understood and agreed that members of Local No. 1408–A shall be given employment if they are available and they can satisfactorily qualify as to physical fitness and experience. The employer is to designate the number of men to be employed and reserves the right to hire and discharge. That all the men to be hired by the header designated by the employer (sic), however, the employer reserves the right to reject men if they feel that they are not qualified.

14. Management of the employer's business and the direction of the work forces in the operation of its business are exclusively vested in the employer as functions of management. Except as specifically provided in this agreement, all of the rights, powers and authority employer had prior to signing this agreement are retained by employer.

Additionally, the collective bargaining contract contains an agreement by the Union and JMA members not to engage in strikes and lockouts during the life of a contract.

15. During the terms of this agreement this employer agrees that there shall be no lockouts of the members of the Union, and the Union agrees that there shall not be any strike of any kind or degree whatsoever, walkout, suspension of work, curtailment of limitation of production, slowdown, or any other interference or stoppage, total or partial, of the employer's operation for any cause whatsoever; such causes including but not limited to unfair labor practices by the employer or violation of this agreement. The right of employees not to cross a bona fide picket line is recognized by the employer. The Union shall not be financially responsible for strikes or walkouts not authorized or assented to by the Union.

---

Finally, the collective bargaining agreement provides for a grievance procedure culminating with binding arbitration of disputes during the life of the contract.

16. Matters under dispute which cannot be promptly settled between the local and individual employer shall, not later than 48 hours after such discussions, be referred in writing covering the entire grievance to a port grievance committee composed of one member from a company not involved in the dispute, the port employer member of the joint negotiating committee, the port union member of the negotiating committee, and a Union member not involved in the previous attempts to settle the dispute. In the event this Port Grievance Committee cannot reach an agreement within five days after receipt of the complaint, the written record of the dispute shall be referred to the joint negotiating committee which will function as a district grievance committee on the following basis:

There must be present at the grievance committee meeting at least three regular employer members and three regular Union members, in addition to the members from the Port originating the dispute as these latter members may participate in the discussion but may not vote. Each side shall have four votes, and if the fifth member on either side is absent he shall authorize his vote to be cast by one of the voting members in attendance. This grievance committee shall meet at least quarterly, and in the case of urgent matters it shall make every effort to meet as soon as possible. A majority decision of this committee shall be final and binding on both parties and on all employers signing this agreement. In the event the committee is unable to reach a majority decision within seventy-two hours after meeting to discuss the case, it shall employ a professional arbitrator whose expenses and fees as well as those of any expert witnesses required by the arbitrator are to be borne jointly by the management and union of the port concerned. Should the committee be unable to agree on the selection of an arbitrator, they shall request the assistance of the Federal Mediation and Conciliation Service in designating a suitable arbitrator. Expenses of the employer members of the district grievance committee are to be borne by the Port employers, and of the Union members of the District Grievance Committee by the I.L.A.

Any decision in favor of an employee involving monetary aspects or discharge shall require the employer involved to make financial restitution from the time of the complaint concerned whereas decisions involving working methods or interpretations shall take effect seventy-two hours after being rendered.

On October 19, 1976, JPA sent an order to the Union hiring hall for two men to work at JPA's Blount Island warehouse on the next day. On October 20, 1976, the two men ordered by JPA were sent from the Union hiring hall to the warehouse, with a third, additional, man who had not been ordered by JPA. All three men reported for work at approximately 8:00 A.M. At that time, Keith Messer, terminal superin-

tendent of the Blount Island warehouse for JPA, informed one of the three men (the header who had been ordered) that the two men who had been ordered could work, but that the third man who was not ordered could not. A discussion ensued; and at approximately 9:30 A.M., the president of the Union, Landon Williams, arrived at the Blount Island warehouse and stated that the three men sent from the Union hiring hall were available for work. Mr. Williams told Allen Cunningham, Director of the Marine Division for JPA, to go ahead and put the additional, third man on the payroll and that they (presumably Williams and Cunningham and perhaps representatively the Union and JPA) would talk about it later. Mr. Cunningham refused and stated that the three men could not work, but only the two who had been ordered. Mr. Williams then replied that there would be no receiving or shipping from that warehouse unless all three men were employed. Thereupon, the three employees and Mr. Williams left the premises of JPA's Blount Island warehouse. As a result, there was no receiving or shipping from the JPA Blount Island warehouse on October 20, 1976.

JPA, on October 20, 1976, again placed orders with the Union hiring hall for two workers in its Blount Island warehouse for October 21 and 22, 1976. On October 21 and 22, 1976, again three men were sent from the Union hiring hall and reported for work at the Blount Island warehouse. On each day, when Mr. Messer told one of the three men (the header who had been ordered) that he could only employ the two men who had been ordered from the hiring hall, the three men gave a solidary response. The three men replied that "the President (Mr. Williams) said to work all three or none at all". On both days JPA refused to employ the third additional man who had not been ordered, and all three men left. On both days there was neither shipping nor receiving at JPA's Blount Island warehouse.

Also on October 19, 1976, Eller sent its order for six workers to report from the Union hiring hall for work on October 20, 1976. On the morning of October 20, 1976, the six men who had been ordered reported to work at Eller from the Union hiring hall, along with an additional two men who had not been ordered. All eight of the men commenced work at approximately 8:00 A.M., and worked until around 10:00 A.M. At that time, Jack Miller, manager of Eller, requested two of the six men who had been ordered, to do work that they had performed in the past, including leaving the forklift tractor to stack pallets. One of those two men, the header, informed Mr. Miller that forklift operators would no longer leave the forklift tractors to perform any kind of warehouse work on the floor. Mr. Miller asked the header if the men who had been ordered and hired were now refusing to do work assigned to them by Eller. After telephoning the Union hiring hall, the header replied that he could only head, but not do any other work as had been done by him in the past. Similarly, it was claimed that forklift operators could do no other work than operate forklift tractors instead of additional warehouse work that had been done by them in the past. Mr. Williams, the President of the Union, admitted in his testimony that he had instructed the workers on October 20, 1976, that headers could only head, forklift drivers could only drive, and "that they could not do any other work." As a result of that discussion, it became clear that none of the workers would do any of the other work that they had performed in the past. All employees who are members of the Union and were working that day ceased working and gathered around the Union header. When Mr. Miller determined that the men would not perform any of their past duties other than those of their specific job title, he instructed his foreman to pay the men for the time they had been employed on the job, but not to let them work any longer with the additional men who had not been ordered.

On October 21 and 22, 1976, essentially the same events occurred at Eller as transpired on October 20th. As a reply for the men's refusal to do other work performed in the past, the Header stated that the men

were doing what the President of the Union (Mr. Williams) had told them to do. When asked if the men wanted their pay for the time that they had been at Eller's premises, the men replied, "Yes." They asserted on both days that they were simply following the orders of Mr. Williams, the President of the Union. On each day the men left the yard without performing any additional work; and on October 22, 1976, they left without performing any work at all or receiving any pay at all. On all three days, October 20th through 22nd, the warehouse of Eller was inoperative because the employees who had been ordered refused to do other work which they had performed in the past, and because Eller would not employ the additional men who had been sent from the Union hiring hall. Although on October 20, 1976, in a telephone conversation between Mr. Williams and Vernon McDaniel, Executive Secretary and Chief Labor Negotiator for JMA, Mr. McDaniel requested Mr. Williams to meet with all of the interested parties in an effort to discuss and resolve the dispute, and if necessary proceed to a grievance, Mr. Williams refused to do so. Neither the plaintiffs nor the defendants in this cause have at any time to this date commenced the grievance procedure provided for in the existing collective bargaining contract between them. On October 23, 1976, at 5:12 P.M., the Court issued a temporary restraining order against the defendants, pursuant to which the Union has sent from its hiring hall only the exact number of men ordered daily by the plaintiffs for work in their warehouses.

## CONCLUSIONS OF LAW

A preliminary injunction, even under a statutorily created right for breach of a collective bargaining contract, remains an extraordinary equitable remedy. *Sampson v. Murray,* 415 U.S. 61, 92 n.68, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974); *Boys Markets, Inc. v. Local 770, Retail Clerks Union,* 398 U.S. 235, 254, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970); *United States Steel Corp. v. UMW,* 519 F.2d 1236, 1243 (5th Cir. 1975); *Canal Authority of State of Fla. v. Callaway,* 489 F.2d 567, 573 (5th Cir. 1974); *Southwestern*

*Bell Teleph. Co. v. CWA,* 454 F.2d 1333, 1334, 1335, 1337 (5th Cir. 1972); *Schrank v. Bliss,* 412 F.Supp. 28, 34 (M.D.Fla.1976). Whether the injunction is issued or denied, the Court must make clear and specific findings of fact and conclusions of law. *Granny Goose Foods, Inc. v. Brotherhood of Teamsters and Auto Truck Drivers, Local 70,* 415 U.S. 423, 443, 94 S.Ct. 1113, 39 L.Ed.2d 435 (1974); *United States Steel Corp. v. UMW, supra* at 1245–46; *Canal Authority of State of Fla. v. Callaway, supra* at 578; *Schrank v. Bliss, supra* at 34. In Section 301 actions for breach of a collective bargaining contract, there are seven necessary criteria that must be satisfied. The first three criteria are those that are peculiarly required for a *Boys Markets* labor injunction under Section 301. *United States Steel Corp. v. UMW, supra* at 1244; *Amstar Corp. v. Amalgamated Meat Cutters & Butcher Workmen,* 468 F.2d 1372, 1373 (5th Cir. 1972); *Southwestern Bell Teleph. Co. v. CWA, supra* at 1334.

(1) breach of a provision in an existing collective bargaining contract.

(2) mandatory grievance or arbitration procedures to resolve disputes arising under the collective bargaining contract.

(3) dispute causing the breach is subject to the grievance or arbitration procedures.

The second four criteria are the standard equitable requirements for any preliminary injunction. *Granny Goose Foods, Inc. v. Brotherhood of Teamsters and Auto Truck Drivers, Local 70, supra* 415 U.S. at 441, 443, 94 S.Ct. 1113; *Sampson v. Murray, supra* 415 U.S. at 84 n.53, 94 S.Ct. 937; *Boys Mrkts., Inc. v. Local 770, Retail Clerks Union, supra* 398 U.S. at 254, 90 S.Ct. 1583; *Buchanan v. United States Postal Service,* 508 F.2d 259, 266 (5th Cir. 1975); *Canal Authority of State of Fla. v. Callaway, supra* at 572; *Blackshear Residents Organiz. v. Romney,* 472 F.2d 1197, 1198 (5th Cir. 1973); *Allison v. Froehlke,* 470 F.2d 1123, 1126 (5th Cir. 1972); *Southwestern Bell Teleph. Co. v. CWA, supra* at 1334, 1337.

(4) irreparable injury because of the unavailability of an adequate remedy at law.

(5) substantial likelihood of the plaintiffs' success on the merits.

(6) threatened injury to the plaintiffs outweighs any possible injury to the defendants.

(7) issuing a preliminary injunction will not work any disservice to the public interest.

The burden of proof is on the plaintiffs to meet each of the criteria. *Canal Authority of State of Fla. v. Callaway, supra* at 572; *Penn v. San Juan Hosp., Inc.,* 528 F.2d 1181, 1185 (10th Cir. 1975). Since the Court balances the evidence on each of those criteria by means of a sliding-scale analysis, a much stronger showing on one or more of the necessary factors lessens the amount of proof required for the remaining factors. *State of Tex. v. Seatrain International, S.A.,* 518 F.2d 175, 180 (5th Cir. 1975); *Siff v. State Democratic Exec. Committee,* 500 F.2d 1307 (5th Cir. 1974); *Delaware Port Authority v. Transamerican Trailer Transport, Inc.,* 501 F.2d 917, 919–20 (3d Cir. 1974). Nevertheless, apart from the distinctively necessary criteria under the *Boys Markets* decision, the principal and overriding prerequisite is irreparable harm resulting from the absence of an adequate remedy at law. *Sampson v. Murray,* 415 U.S. 61, 88–92 and n. 68, 94 S.Ct. 937, 39 L.Ed.2d 166; *A. O. Smith Corp. v. FTC,* 530 F.2d 515, 525 (3d Cir. 1976); *Schrank v. Bliss, supra* at 35.

1. *Breach of the collective bargaining contract*

Plaintiffs contend that defendants' conduct constitutes a strike as defined by Congress in 29 U.S.C. § 142(2). In response, defendants argue that plaintiffs have engaged in a lockout of the Union's members at JPA's and Eller's warehouses. In either event, or both, the conduct would violate the agreement not to engage in strikes or lockouts during the life of the contract, as provided in article 15. Defendants, however, have not sought injunctive relief from plaintiffs' alleged violation of the collective bargaining contract. Consequently, for the purpose of determining whether plaintiffs have met their burden of satisfying the first criterion for a preliminary labor injunction, it is sufficient that the Court decide whether defendants' conduct constitutes a strike in violation of the currently enforceable contract. The Court so holds.

29 U.S.C. § 142(2) provides:

The term "strike" includes any strike or other concerted stoppage of work by employees (including a stoppage by reason of the expiration of a collective-bargaining agreement) and any concerted slowdown or other concerted interruption of operations by employees.

In *Lodge 76, Internat'l Ass'n of Machinists and Aerospace Workers v. WERC,* 427 U.S. 132, 150 n. 12, 96 S.Ct. 2548, 2558 n. 12, 49 L.Ed.2d 396, 409 n. 12 (1976), the United States Supreme Court recently declared:

We do note, however, that in determining the entire structure of the federal law respecting the use of economic pressure and the economic weapons assumed by Congress to be available to the parties, *it is not insignificant that § 501(2) [29 U.S.C. § 142(2)] in defining the term "strike" refers to the use of "any concerted slow-down or other concerted interruption of operations by employees." "It is hardly conceivable that such a word as 'strike' could have been defined in these statutes without congressional realization of the obvious scope of its application."* (emphasis supplied),

citing *NLRB v. Insurance Agents Internat'l Union,* 361 U.S. 477, 511 n. 6, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960) (Frankfurter, J., separate opinion). Obviously also, the scope of that same legislative definition of 'strike' applies as well when a party (1) agrees to refrain from such conduct during the life of a collective bargaining contract, (2) breaches that agreement, and (3) the other party is forced to seek the injunctive relief available under Section 301. In the absence of any controlling contractual definition of 'strike', the Court will characterize defendants' conduct on the basis of federal law, 29 U.S.C. § 142(2); and in so doing, the Court will look past the mere labels that defend-

ants use, to the real nature of the conduct. *Adley Express Co. v. Local 107, Highway Truck Drivers and Helpers,* 349 F.Supp. 436, 441–42 (E.D.Pa.1972). The Court, therefore, holds that the refusal of the Union's members at JPA and Eller, on the instructions of Mr. Williams, to perform work under direction, and the resultant shutdown of shipping and receiving at those warehouses unless plaintiffs capitulated to defendants' side of the dispute, unquestionably constitutes conduct included in the definition of 'strike' in 29 U.S.C. § 142(2). The Court further holds that such conduct also constitutes a breach of the no-strike agreement in article 15 of the collective bargaining contract.

### 2. *Mandatory grievance and arbitration procedures*

To be entitled to a preliminary labor injunction, plaintiffs must show that JMA and the Union have a general duty to submit disputes arising under the current collective bargaining contract to grievance and arbitration procedures. Only if plaintiffs and defendants have contractually bound themselves to resolve grievances in such a manner will the Court compel them to do so. *Gateway Coal Co. v. UMW,* 414 U.S. 368, 374, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974); *Boys Mrkts., Inc. v. Local 770, Retail Clerks Union,* 398 U.S. 235, 254; 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970). The longstanding reason is that under the federal common law of labor parties agree to refrain from strikes or lockouts in exchange for a duty to settle their grievances by the peaceful method of arbitration. The one duty arises as a quid pro quo for the other. *NLRB v. Magnavox Co.,* 415 U.S. 322, 362, 94 S.Ct. 1099, 39 L.Ed.2d 358 (1974); *Boys Mrkts., Inc. v. Local 770, Retail Clerks Union, supra,* 398 U.S. at 248, 90 S.Ct. 1583 (1970); *Local 174, Teamsters 174, Chauffers, Warehousemen & Helpers v. Lucas Flour Co.,* 369 U.S. 95, 106, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962); *Textile Workers Union v. Lincoln Mills,* 353 U.S. 448, 455, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957); *United States Steel Corp. v. UMW, supra* at 1242. On its face, the language of article 16 in the current contract between plaintiffs and defendants points univocally to one conclusion: plaintiffs and defendants have agreed to settle their controversies concerning the contract by the grievance and arbitration machinery provided in the contract. The Court holds that plaintiffs and defendants have so bound themselves and are therefore under a general duty to resolve their contractual disagreements through peaceful arbitration.

### 3. *Arbitrable underlying dispute*

Having held that defendants have breached their duty not to strike, and that defendants and plaintiffs are bound to resolve their contractual grievances through peaceful arbitration, the Court must now determine whether plaintiffs have successfully demonstrated that the specific, underlying dispute that provoked the strike is one that is subject to the contract's mandatory grievance and arbitration procedures. To begin with, the Court notes that under federal labor law there is a strong presumption in favor of the arbitrability of disputes. That presumption is a corollary of the national labor policy, legislated by Congress, favoring peaceful and stable labor relations, where arbitration replaces industrial strife and its detrimental effects upon the nation's economic and social health. *Gateway Coal Co. v. UMW,* 414 U.S. 368, 377–80, 382, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974); *Boys Mrkts., Inc. v. Local 770, Retail Clerks Union, supra* 398 U.S. at 248–49, 90 S.Ct. 1583 (1970); *USW v. Warrior & Gulf Navig. Co.,* 363 U.S. 574, 582–83, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *Textile Workers Union v. Lincoln Mills,* 353 U.S. 448, 458, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957); *United States Steel Corp. v. UMW,* 519 F.2d 1236, 1242, 1243–44 (5th Cir. 1975); *Southwestern Bell Telph. Co. v. CWA,* 454 F.2d 1333, 1334, 1336–37 (5th Cir. 1972). The courts, however, are not the forum for arbitration; and this Court has no jurisdiction to decide the particular subject matter of the present dispute. *Southwestern Bell Telph. Co. v. CWA, supra* at 1336. Instead, the Court must decide only whether plaintiffs have met their burden to show that

the present dispute is governed by the contract's grievance and arbitration machinery in article 16. *Id.* The standard is arguable arbitrability, and the test is whether the particular claim involved in the dispute "on its face is governed by the contract and which is 'arguably arbitrable.'" *Id.* at 1336, 1337. *District 776, Internat'l Ass'n. of Machs. & Aerospace Workers v. Texas Steel Co.,* 538 F.2d 1116, 1119–20 (5th Cir. 1976).

In this case, there is no disagreement by plaintiffs and defendants that their dispute is one arising under, and concerning, the interpretation of the current collective bargaining contract, and that as such the dispute is controlled by the contract's mandatory grievance and arbitration provision. Mr. Williams, the Union's President, expressly admitted that the present dispute is over the meaning of the existing contract. Moreover, articles 7 and 14 of that contract (quoted above), along with article 3A squarely encompass the present dispute. The Union points to article 3A as justification for insisting that the additional men should be employed. JPA and Eller, on the other hand, point to articles 7 and 14 as authority for resisting the additional employees.

 There is no question that if plaintiffs and defendants have not bound themselves contractually to refrain from strikes and lockouts, in exchange for a grievance arbitration, they are free legally to resort to economic warfare. Strikes, lockouts, and replacement in hiring by employers and union members, are activities that are neither protected by § 7 (29 U.S.C. § 157), nor prohibited by § 8 (29 U.S.C. § 158), of the National Labor Relations Act ('NLRA'), *Local 76, International Ass'n. of Machs. & Aerospace Workers v. WERC,* 427 U.S. 132, 143–47, 96 S.Ct. 2548, 2554–56, 49 L.Ed.2d 396, 405–07 (1976). *American Ship Bldg. Co. v. NLRB,* 380 U.S. 300, 317–18, 85 S.Ct. 955, 13 L.Ed.2d 27 (1965); *NLRB v. Insurance Agents Internat'l Union,* 361 U.S. 477, 491, 494–95, 497–99, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960). Hence, under the preemptive primacy of federal labor law, *Boys Mrkts., Inc. v. Local 770,*

*Retail Clerks Union,* 398 U.S. 235, 242, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970); *Local 174, Teamsters, Chauffeurs, Warehousemen Helpers v. Lucas Flour Co.,* 369 U.S. 95, 103–04, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962); *Textile Workers Union v. Lincoln Mills,* 353 U.S. 448, 456–57, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957); *Avco Corp. v. Lodge No. 735, Internat'l Ass'n. of Machs. & Aerospace Workers,* 390 U.S. 557, 88 S.Ct. 1235, 20 L.Ed.2d 126 (1968), *aff'g* 376 F.2d 337, 340 (6th Cir. 1967); *Local 1928, Glaziers, Glassworkers v. Florida Glass & Mirror of Jacksonville, Inc.,* 409 F.Supp. 225, 226–27 (M.D.Fla.1976), courts may not forbid, or otherwise regulate, the permissible free play of such economic forces between parties. *Local 76, Intern'l Ass'n. of Machs. & Aerospace Workers v. WERC,* 427 U.S. 132, 139–55, 96 S.Ct. 2548, 2552–60, 49 L.Ed.2d 396, 403–12 (1976). Where, however, (as in this case) the parties using strikes, lockouts, or other pressure tactics of economic self-help, have agreed to forbear using such economic weapons in favor of peaceful settlement of disputes through arbitration, their contractual obligations and duties to do so displace the otherwise unregulability of that conduct.

 That is precisely the situation here. This is not a political strike concerning a social or governmental issue, where the underlying dispute is between the union's members and some form of state or federal government. *See, e. g. United States Steel Corp. v. UMW,* 519 F.2d 1236, 1240, 1247–48 (5th Cir. 1975). Neither is this a sympathy strike situation where a union's members refuse to cross the picket lines of a sister union's strike. *See, e. g., Buffalo Forge Co. v. United Steelworkers of America,* 428 U.S. 397, 407–409, 96 S.Ct. 3141, 3147–48, 49 L.Ed.2d 1022, 1031–32 (1976). In those cases, there is no direct dispute between the union and the employer. Hence, a fortiori there could not be any arbitrable dispute under the collective bargaining contract to warrant a preliminary labor injunction under the *Boys Markets* exception to the Norris-La Guardia Act's anti-injunction provisions (29 U.S.C. §§ 104, 108). Instead, the

present dispute concerns the hiring of Union members and the duties of work performed—patently terms and conditions of employment. The Court, therefore, holds that this dispute clearly concerns the existing collective bargaining contract and is subject to its grievance and arbitration provisions.

### 4. Irreparable injury

As already noted, Congress has declared that the national labor policy is to promote peaceful settlement of disputes without disruption in labor relations. Whenever, therefore, any party ignores its agreement to resolve contractual disputes through nondisruptive arbitration, and resorts instead to the economic weapons of strikes, lockouts, or other pressure tactics, the turmoil necessarily defeats the national labor policy and harms those national interests that lie at the heart of that policy. Cf. Gateway Coal Co. v. UMW, 414 U.S. 368, 386, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974). There are no compensatory legal remedies available to repair damage of that kind of scale and dimension. That is the objective form of irreparable harm that results when the duty to settle labor disputes by peaceful arbitration is breached. Plaintiffs, additionally, must show that their injury, actual or threatened, is an instance of that irreparable harm. If, after relinquishing contractually the right to use economic weaponry in exchange for binding arbitration of grievances, one of the parties resorts to such tactics, the other party loses the benefit for which he bargained: uninterrupted and stable labor relations. Buffalo Forge Co. v. United Steelworkers of America, 428 U.S. 397, 405–409, 411, 96 S.Ct. 3141, 3146, 3148–49, 49 L.Ed.2d 1030–31, 1033 (1976). That loss is probably incommensurable and therefore not compensable by any legal remedy.

Furthermore, there is ample testimony to establish that when shipping and receiving is halted by labor unrest at an international port like Jacksonville, shipping companies will take their business away to other, dependable ports. So, while an arbitrator's decision might award backpay to the additional Union members at issue in this dispute if the Union should prevail, there is no legal remedy that can measure and replace business lost to plaintiffs because of the shutdown of shipping and receiving. Such loss is not mere inconvenience, Division 1384, Amalg. Transit Union v. Greyhound Lines, Inc., 529 F.2d 1073, 1078 (9th Cir. 1976), but an irreparable injury. The Court thus holds that plaintiffs have demonstrated that irreparable harm has occurred, and will continue to occur, if defendant's breach of their no-strike agreement is not enjoined.

### 5. Likelihood of success on the merits

Under the usual circumstances, a plaintiff seeking a preliminary injunction must show that he is more likely than not to prevail ultimately on the merits of his claim. The Court thus is required to make an interim, preview evaluation of the case. Penn v. San Juan Hospital, Inc., 528 F.2d 1181, 1185 (10th Cir. 1975).

In the labor injunction situation, however, this particular requirement must be modified. The Court cannot preliminarily, or otherwise, assess the merits of contractual labor disputes. The national labor policy, expressed in 29 U.S.C. § 104 of the Norris-La Guardia Act, withholds jurisdiction from the Court to decide the merits of such disputes. Buffalo Forge Co. v. United Steel Workers of America, 428 U.S. 397, 409–412, 96 S.Ct. 3141, 3148–49, 49 L.Ed.2d 1022, 1032–33 (1976). Moreover, the language of the current contract between JMA and the Union, agreeing to arbitrate contractual disputes, reveals that neither party bargained for judicial arbitration of their disputes. Id. at 411, 96 S.Ct. at 3149, 49 L.Ed.2d at 1033. Hence, insofar as the Court is prohibited from considering the merits of the present dispute, the only remaining issue is to determine whether that dispute is arguably arbitrable under the collective bargaining contract. The Court has already held that this dispute is arguably arbitrable. Therefore, plaintiffs have satisfied the only facet of this criterion for a preliminary

injunction that is properly cognizable by the Court under § 301 jurisdiction. *Division 1384, Amalg. Transit Union v. Greyhound Lines, Inc.,* 529 F.2d 1073, 1077–78 (9th Cir. 1976).

### 6. *Plaintiffs' harm outweighs defendants' possible harm*

The Court has already held that plaintiffs have met their burden to demonstrate irreparable injury. The burden to produce evidence of some harm now shifts to defendants. Defendants argue that plaintiffs could capitulate to their demands in the dispute and be compensated for damages, if plaintiffs should prevail rather than defendants. That argument is inconsistent with the Court's holding that plaintiffs have sustained, and will continue to sustain, irreparable injury.

On the other hand, enjoining defendants and plaintiffs from further strikes, work stoppages and interruptions, and lockouts, while ordering them to proceed to arbitration, requires nothing more from them than that which they have already agreed to do under the current contract. Moreover, if on the merits at arbitration defendants should prevail on their claim in the present dispute, (1) they are able to be compensated by an arbitrator's award on their behalf; (2) this Court will enforce any award by the arbitrator; and (3) the irreparable injury that plaintiffs otherwise would sustain will be prevented. Consequently, the Court holds that the irreparable injury which plaintiffs will suffer if this injunction were denied far exceeds any harm that defendants might suffer temporarily.

### 7. *Issuing a preliminary injunction will disserve the public interest*

Finally, because the national public policy favors peaceful arbitration to resolve industrial strife where the disputants have agreed to do so, the denial of a preliminary injunction in this case will permit that policy to be thwarted and the public's interest will be disserved. To order plaintiffs and defendants to cease violating their duty to arbitrate contractual disputes upholds the national policy and thereby furthers the public interest; and the Court so holds.

The Court will issue this injunction forthwith and expects prompt and scrupulous compliance with it by plaintiffs and defendants. *Maness v. Meyers,* 419 U.S. 449, 458–59, 95 S.Ct. 584, 42 L.Ed.2d 574 (1975); *United States v. UMW,* 330 U.S. 258, 293, 67 S.Ct. 677, 91 L.Ed. 884 (1947). While the Court's findings and conclusions herein are firm for the purpose of issuing this injunction, they must remain tentative and provisional, so as not to influence any arbitrator's decision on the merits, which would be enforceable in this Court. *Cf. Poe v. Charlotte Memorial Hosp.,* 374 F.Supp. 1302, 1312 (W.D.N.C.1974).

Therefore, it is now

ORDERED:

1. Plaintiffs' motion for preliminary injunction is hereby granted.

2. Defendants are hereby enjoined from any further strikes, work stoppages, or interruptions in work performances, or any authorization of the same, concerning this present dispute over the number of employees to be hired by plaintiffs.

3. Plaintiffs are hereby enjoined from any lockout of the members of defendant Union concerning this present dispute over the number of employees to be hired by plaintiffs.

4. Plaintiffs and defendants in this case are hereby ordered to proceed at once to the grievance procedures and binding arbitration for this present dispute that they are obligated to do under article 16 of the existing collective bargaining contract between them.

5. Plaintiffs are hereby ordered to post a bond of $1,000.00 with the Clerk of the Court as security for this preliminary injunction, pursuant to Fed.R.Civ.P. 65(c), at which time this injunction shall become effective.