489 F.2d 567
 6 ERC 1801, 4 Envtl. L. Rep. 20,164
 The CANAL AUTHORITY OF the STATE OF FLORIDA et al.,
Plaintiffs-Appellees,
v.
Howard H. CALLAWAY, Secretary of the United States Army, et
al., Defendants-Appellants.
The CROSS-FLORIDA CANAL ASSOCIATION et al., Plaintiffs-Appellees,
v.
howard H. CALLAWAY, Secretary of the United States Army, et
al., Defendants-Appellants.
Eleanor H. MILLER et al., Plaintiffs-Appellees,
v.
Avery S. FULLERTON et al., Defendants-Appellants.
ENVIRONMENTAL DEFENSE FUND, INC., et al., Plaintiffs-Appellants,
v.
CORPS OF ENGINEERS OF the UNITED STATES ARMY et al.,
Defendants-Appellants.
J. G. PERKO, Plaintiff-Appellee,
v.
The CANAL AUTHORITY OF the STATE OF FLORIDA, etc., et al.,
Defendants-Appellants.
 No. 73-2487.
 United States Court of Appeals, Fifth Circuit.
 Feb. 15, 1974, Rehearing and Rehearing En Banc Denied April 10, 1974.
 
 Jacques B. Gelin, Wallace H. Johnson, Edmund B. Clark, Dept. of Justice, Washington, D.C., Frederick L. Miller, Dept. of Justice, Div. of Lands & Nat. Resources, Washington, D.C., John L. Briggs, U.S. Atty., John D. Roberts, Asst. U.S. Atty., Jacksonville, Fla., for all fed. defendants.
 Jon T. Brown, Wallace L. Duncan, Washington, D.C., Edward Lee Rogers, Gen. Counsel, Environmental Defense Fund, Inc., East Setauket, N.Y., for Env. Defense and others.
 Ralph E. Elliott, Jr., Frank C. Decker, Jacksonville, Fla., John H. Gullett, Washington, D.C., for Canal Authority and others.
 Willard Ayres, Ocala, Fla., for Canal Authority of State of Fla.
 David U. Tumin, Daniel U. Livermore, Jr., Jacksonville, Fla., for Jacksonville Port Authority.
 A. W. Nichols, III, Ronald E. Clark, Palatka, Fla., for Eleanor H. Miller and others.
 William L. Eagan, Orlando, Fla., for Perko.
 Tracy Danese, Jacksonville, Fla., for Cross-Fla. Assoc. and others.
 Alan B. Fields, Jr., Palatka, Fla., for Eleanor H. Miller and others.
 Before THORNBERRY, GOLDBERG and INGRAHAM, Circuit Judges.
 THORNBERRY, Circuit Judge:
 
 
 1
 This is an appeal from the denial of defendants' motion to modify a preliminary injunction which prevents defendants from reducing the water level of Lake Ocklawaha below eighteen feet above mean sea level (m.s.l.). We find that the district court applied the wrong legal standards in considering the motion to modify, and we remand for further consideration under the proper standards.
 
 Factual Setting
 
 2
 The Ocklawaha River has its source in several large lakes of the central peninsula of Florida. It flows northward for sixty miles and enters the St. Johns River eight miles below Lake George. Its waters run clear, although stained by acids from the bark and leaves of the dense tree swamp through which it meanders. Its tree swamp ecology is rich, supporting a much more abundant and varied wildlife population than the adjacent pine islands. It is, as President Nixon described it, '(a) natural treasure . . . a uniquely beautiful, semi-tropical stream, one of a very few of its kind in the United States . . ..'[1]
 
 
 3
 The trees along the Ocklawaha are the cornerstone of the area's ecology. Their crowns close the canopy of the forest, creating the necessary balance of light, temperature, humidity and wind. They and their associated understory vegetation act as a nutrient and a biological filter in cleansing the river in time of flood. They provide food and habitat for birds, epiphytic plants and wildlife. Leaf fall from the natural forest overstory adjacent to the river is an important component of the allochthonous energy inputs required for maintenance of the high productivity of the detritusbased river system. The trees provide the seeds necessary for regeneration of the forest. The loss of these trees would drastically change the character of the area, and, once lost, they could not be replaced by new growth for decades.
 
 
 4
 As part of the Cross Florida Barge Canal project, Rodman Dam was built on the Ocklawaha River. After the dam's completion in 1968, the waters it impounded created a lake approximately sixteen miles long, flooding some 13,000 acres of partially cleared land in the Ocklawaha Valley. A number of the trees in this area had previously been cleared by being crushed into the swamp floor. However, approximately 1135 acres of large hardwood trees, many of which had lined the course of the Ocklawaha River prior to the inundation, were left standing to be flooded by the lake, primarily so as to serve as a fish habitat. The flooding is progressively killing off the remaining trees. The preservation of the surviving trees in this presently standing timber was the objective of the motion denied by the district court.
 
 History of the Litigation
 
 5
 In September, 1969, the Environmental Defense Fund, joined by the Florida Defenders of the Environment and several individuals, filed suit in the United States District Court for the District of Columbia to halt construction of the Cross Florida Barge Canal project. After a hearing, the district court denied the defendants' motion to dismiss and orally granted the plaintiffs' motion for a preliminary injunction to stop certain aspects of the construction. Before these orders were entered the President of the United States, pursuant to the advice of the Council on Environmental Quality, ordered the suspension of further construction of the canal.[2] The Canal Authority of the State of Florida, the local sponsor of the project, then moved to intervene in the District of Columbia action alleging that as a result of the President's order the federal defendants were no longer able to defend the canal project.
 
 
 6
 Prior to the granting of the motion, the Canal Authority filed a second action in the Middle District of Florida against substantially the same defendants, alleging wrongful termination of the project. Later, other similar suits were filed by local governmental and individual interests. On July 27, 1971, the Judicial Panel on Multidistrict Litigation ordered the actions consolidated and transferred to the Middle District of Florida, to be heard before Senior Circuit Judge Harvey M. Johnsen.
 
 
 7
 Prior to the consolidation the United States Forest Service recommended that Lake Ocklawaha be drained, so as to preserve as many trees as possible. The Canal Authority, as intervenor in the District of Columbia litigation, unsuccessfully sought a preliminary injunction to prevent the drawdown. Such an injunction was granted, however, in the case brought in the Middle District of Florida by the Cross-Florida Canal Association. After the consolidation, Judge Johnsen considered afresh the question of a preliminary injunction to prevent the proposed drawdown and granted it on September 29, 1971, after three days of evidentiary hearing and argument. The injunction order specifically invited subsequent applications for 'vacative or modificatory' relief from the preliminary injunction if facts could be developed to justify such relief.
 
 
 8
 After several unsuccessful attempts to have the injunction modified, the joint appellants moved again for modification on June 1, 1972. This motion was based on extensive scientific investigations and studies conducted by an interagency task force during the months of April and May, 1972. The task force was composed of more than fifty experts in the fields of ecology, forestry, plant physiology and pathology, aquatic weeds, recreation, fisheries, biology, photogrammetry, hydrology, biochemistry, engineering, agronomy, and mathematics. Following its investigations, the task force recommended that Lake Ocklawaha be lowered immediately to an elevation of thirteen feet m.s.l. to preserve the large number of living trees threatened with imminent death so as to maintain all future options for ecologically sound use of the area.
 
 
 9
 After four days of hearings, on July 21, 1972, the district court granted the motion of the joint appellants for a modification of the temporary injunction, allowing the lake to be drawn down from eighteen feet m.s.l. to thirteen feet m.s.l. for the balance of the 1972 growing season, i.e., until December 1, 1972. The court noted that
 
 
 10
 the array of the task force personnel and its expert consultants is so formidable and the strength of their opinion (is) such that the court does not feel entitled to allow such layman's doubt as it may have to control against the strong body of this expert opinion. Further, the difference in the extent of the methods and factors involved, as between these experts and those of the Canal Authority, seems to the court to require the according of a more persuasive general weight to the opinion of the Federal defendants' experts.
 
 
 11
 The evidence adduced in securing a temporary drawdown had been gathered while the trees were flooded. During the drawdown period, these scientists were able to make far more precise analyses of both the flooding effect and the trees' growth process. On November 27, 1972, the federal defendants moved to extend the drawdown period until a final decision had been made about the future of the area. The court twice extended the deadline for reflooding in order to allow all parties to file additional pleadings and affidavits. On December 8, 1972, the federal defendants filed a supplemental memorandum, together with voluminous affidavits supporting their position. A central finding was that the tree roots in the area had no dormant period. Although some trees lose their leaves during the winter, root growth activity continues. Accordingly, earlier projections that recommended limiting a drawdown to the so called 'growth season' were proved The only recommended scientific solution to save the trees was to keep the lake's waters at the low level. Otherwise, the scientists predicted, large numbers of trees (estimated at up to 120,000) would die and the river's swamp forest condition would be imperiled.
 
 
 12
 Despite the new scientific evidence, the district court issued an order denying the requested drawdown. The court did not reject the government's essentially unchallenged scientific evidence, but rather based its decision on a balancing of other factors, such as the adverse effect of a drawdown on recreation, wildlife habitat, fisheries, and aesthetics, the effect of continuing the injunction on advancing the trial on the merits, and the fact that the public might consider a modification of the injunction so as to continue the drawdown a herald of doom for the entire canal project.
 
 
 13
 The district court order denying modification of the original temporary injunction was dated January 12, 1973. On February 8, 1973, the federal defendants filed a motion for an expedited trial and for reconsideration of the court's January 12 order. Because of the court's ruling that they were out of time on the reconsideration aspect, the federal defendants substituted a motion for modification of the September 29, 1971, injunction. On March 28, 1973, the district court denied the motion, and this appeal followed.
 
 
 14
 General Requirements for a Preliminary Injunction
 
 
 15
 A preliminary injunction may be issued to protect the plaintiff from irreparable injury and to preserve the district court's power to render a meaningful decision after a trial on the merits. The grant or denial of a preliminary injunction rests in the discretion of the district court. Johnson v. Radford, 5 Cir. 1971, 449 F.2d 115. The district court does not exercise unbridled discretion, however. It must exercise that discretion in light of what we have termed 'the four prerequisites for the extraordinary relief of preliminary injunction.' Allison v. Froehlke, 5 Cir. 1972, 470 F.2d 1123, 1126. The four prerequisites are as follows: (1) a substantial likelihood that plaintiff will prevail on the merits, (2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury to plaintiff outweighs the threatened harm the injunction may do to defendant, and (4) that granting the preliminary injunction will not disserve the public interest. Di Giorgio v. Causey, 5 Cir. 1973, 488 F.2d 527; Blackshear Residents Organization v. Romney, 5 Cir. 1973, 472 F.2d 1197.
 
 
 16
 In considering these four prerequisites, the court must remember that a preliminary injunction is an extraordinary and drastic remedy which should not be granted unless the movant clearly carries the burden of persuasion. The primary justification for applying this remedy is to preserve the court's ability to render a meaningful decision on the merits.
 
 
 17
 Although the fundamental fairness of preventing irremediable harm to a party is an important factor on a preliminary injunction application, the most compelling reason in favor of (granting a preliminary injunction) is the need to prevent the judicial process from being rendered futile by defendant's action or refusal to act.
 
 
 18
 Wright & Miller, Federal Practice and Procedure: Civil 2947. Thus only those injuries that cannot be redressed by the application of a judicial remedy after a hearing on the merits can properly justify a preliminary injunction.
 
 
 19
 Factors Actually Considered by the District Court
 
 
 20
 In neither its original order of September 29, 1971, which granted the preliminary injunction, nor in any of the subsequent orders dealing with it were the foregoing requirements explicitly or implicitly the focus of the discussion. In fact, at the outset, in the September 29 order, the court improperly placed on the defendants the burden of proving that the preliminary injunction should not issue, when it stated that 'I am not, however, persuaded on the conflicting evidence that a temporary drawdown . . . as sought by the Government . . . would result in the preservation of the life of such a number of trees as to entitle this to be controlling . . ..' This erroneous placement of the burden of proof on this issue of harm to the defendants was also evident in the order of July 21, 1972. The court did allow a temporary drawdown, but only because the defendants had come forward with such a formidable array of experts who held such strong opinions that they overwhelmed the court's 'layman's doubt' as well as the expert opinion offered by the Canal Authority. Finally, the order of January 12, 1973, reinstated the original injunction and required the lake level to be raised again because 'the question of saving such a quantity of trees . . . as the Federal defendants contend is possible (did) not seem to (the court) to be a matter of such probable environmental and ecological certainty as to require (the court) to go beyond the temporary drawdown . . ..'
 
 
 21
 Under the proper view of the law, it should not have been incumbent upon the defendants to prove by a preponderance of the evidence, much less to a 'probable environmental and ecological certainty,' that the interests they represent would suffer irreparable harm. The burden of persuasion on all of the four requirements for a preliminary injunction is at all times upon the plaintiff.
 
 
 22
 The district court also erred in assuming that a preliminary injunction is normally available in cases such as these. In the order of September 29, 1971, it is stated that 'the completed Rodman Pool has been permitted to acquire such a substance of environmental, ecological and recreational elements as to give rise to a status quo that would normally be entitled to temporary protection except as against the existence of other clear and overriding public factors.' This completely loses sight of the rule that a preliminary injunction is an extraordinary remedy, not normally available unless the plaintiff clearly carries his burden of proof as to its prerequisites. There is always a status quo. There should not be a preliminary injunction to protect it, however, unless the court's ability to render a meaningful decision on the merits would otherwise be in jeopardy.
 
 
 23
 To be sure, preliminary injunctions have often been properly granted in environmental litigation. See, e.g., West Virginia Highlands Conservancy v. Issland Creek Coal Co., 4 Cir. 1971, 441 F.2d 232; Boston Waterfront Residents Association, Inc. v. Romney, D.Mass.1972, 343 F.Supp. 89; Scherr v. Volpe, W.D.Wisc.1971, 336 F.Supp. 882, aff'd, 7 Cir. 1972, 466 F.2d 1027. In all such cases, however, preliminary injunctions have been issued not merely because some impact upon the environment has been alleged, but because the threatened harm has been properly shown to be irreparable, in accordance with the usual test for a preliminary injunction. Indeed, where no irreparable injury is alleged and proved, denial of a preliminary injunction is appropriate. Environmental Defense Fund v. Hardin, D.D.C.1971, 325 F.Supp. 1401.
 
 
 24
 In this case, the district court did rely on the fact that there would be an adverse impact upon the new lake environment if the water level were drawn down. The court made no finding, however, that such an impact would be irreparable or irreversible. Since the lake's ecology evolved from scratch in the relatively few years the lake has been in existence, it seems possible that it could be as quickly restored even if the water level is now lowered, and there is evidence in the record to this effect. A proper preliminary injunction, however, would have to rest on an opposite finding, i.e., that the damage to be done by the drawdown will be irreparable. No such finding was made.
 
 
 25
 Similarly, the district court relied on the fact that a drawdown of the lake would adversely affect 'the fishing, boating, picnicking, accessibility, and other general recreational uses of the existing lake.' This is also unsupported by any further finding that the adverse effect on recreation could not be repaired by a simple refilling of the lake. such a further finding of irreparability is necessary, however, if this factor is to be relevant to the question of a preliminary injunction.
 
 
 26
 In its order of September 29, 1971, the district court lists as one of the adverse effects that 'such a drawdown also would physically and psychologically strike at the status quo of this purportedly completed portion of the Cross-Florida Barge project-- in the heated climate which clearly exists . . ..' In the order of July 21, 1972, Judge Johnsen explained further his thinking at the time of the first order:
 
 
 27
 With the situation thus being . . . subject to the implication that it might perhaps be intended thereby to impose a self-death impression in the public mind (as the Canal proponents charged), it seemed probable that the Canal proponents would be entitled to some form of declaratory pronouncement or judgment, with the court regarding this probability as providing a supportive element both as to the issuance of the preliminary injunction and as to the refusal to modify it for the remainder of the 1971 growing season.
 
 
 28
 As he further explained in the July order,
 
 
 29
 There was in addition an intangible factor which seemed to permeate the 1971 proceedings. The Rodman Pool appears to be the most symbolic portion or element of the Canal project as thus far constructed. In the seeming hastiness of the Federal defendants to make reach at the Rodman Pool, before they were able to show that any procedures had yet been or were going to be promptly engaged in under the National Environmental Policy Act, the situation was not without an implication of a desire to effect a swift psychological blow for public impression that the whole Canal project would be undergoing a summary demise. The feeling of general unfairness which properly could and which the court sensed did in wide measure so exist was a matter which the court deemed it owed some judicial responsibility not to permit to be fostered, except as clear and overbalancing public interest commanded the action which was being sought to be engaged in.
 
 
 30
 Whatever symbolic quest there might thus have been involved should by now have lost its anesthetizing force.
 
 
 31
 This factor was still seen as important in the order of January 12, 1973, the subject of the present appeal:
 
 
 32
 Refusal to reopen the question of the level of the Rodman Pool . . . will also prevent the Rodman Pool from continuing to be publicly symbolized and heralded on the basis of the attempt made to change its status quo, its conditions and its uses, as necessarily portending the doom and dismantling of the whole Barge Canal project and being psychologically used to sway public sentiment by those who have no concern about or responsibility for whether the administrative and judicial processes are afforded opportunity to properly dispose of the question.
 
 
 33
 We do not regard the question of the psychological impact of an order on either the parties or the public as a relevant consideration under the facts of this case. In no way does it affect the court's ability to render a meaningful decision on the merits: it neither enhances nor detracts from plaintiff's chances of success on the merits; it tends neither to show nor negate irreparable injury to either party; and it is not probative on the issue of the public interest. It may well be true, of course, that any order-- either granting or denying the preliminary injunction-- may have a psychological effect on the parties or, in a well publicized case such as this, the public, although the existence of such an effect and its content are highly speculative. In any event, in the absence of a finding of any relevance to the requirements for a preliminary injunction, we do not think the district court should have taken this factor into account.
 
 
 34
 In its order of January 12, 1973, the district judge relied on yet another irrelevant factor when he recited that 'I am of the belief that a refusal to reopen the question of the level of the Rodman Pool, at least until the cases have been tried, will serve to bring the trial situation to a head.' While we certainly favor expedition in the handling of judicial affairs, we fail to see how this in itself relates to any of the prerequisites for a preliminary injunction, and the district court made no explicit finding that it was in any way relevant to them. It might be that the injunction itself, by keeping the water level up and thus contributing to the progressive killing of the trees, would spur the defendants in their desire to do everything possible to hasten the hearing on the merits. We are reluctant to believe, however, that the district court would utilize a preliminary injunction, an equitable remedy, for the inequitable purpose of inflicting progressive injury upon a party, merely in order to advance the litigation on the merits. Suffice it to say that the district court made no finding as to the relevance of this factor to any of the considerations material to the grant or denial of a preliminary injunction.
 
 
 35
 Finally, in its discussion of the harm done by the injunction to the ecological interests represented by defendants, the court stated that
 
 
 36
 the tree acreage involved in Population 5 is relatively small in terms of the area being merged into and made to constitute a part of the Ocala National Forest. It is much less in size than forest areas throughout the country which have often become the subject of devastation by fire . . ..
 
 
 37
 We find such comparisons irrelevant. Assuming that the threatened harm is more than de minimis, it is not so much the magnitude but the irreparability that counts for purposes of a preliminary injunction. Neither the rest of the trees in the Ocala National Forest nor the trees regrettably lost to forest fires are properly before the district court for consideration. The only trees over which the court has jurisdiction are those presently being flooded by Lake Ocklawaha. These are the very trees which formerly lined the Ocklawaha River, the loss of which will destroy the basis of the river's ecology-- hardly a de minimis result. The irreparability of the harm if these trees are lost is not diminished by reference to the large number of other trees in the Ocala National Forest, none of which can support the ecology of the Ocklawaha River, since they do not line its banks. Similarly, the irreparability of the threatened harm, which is preventable, is not diminished by comparison to the nationwide loss of trees caused by forest fires that the district court is powerless to prevent.
 
 Further Proceedings
 
 38
 Since the district court was not applying the proper legal standards, it considered many factors that were not relevant, and it failed to support its actions with proper findings of fact and conclusions of law. The motion to modify the preliminary injunction must now be reconsidered in light of the proper standards. Since the evidence is complex and the district court is in a better position to evaluate it, having heard the evidence and arguments in the first instance, we think it more appropriate to remand to that court for reconsideration than attempt it ourselves. In the interest of judicial economy, we offer the following for guidance on remand.
 
 
 39
 First and foremost, we reemphasize the importance of the general requirements for a preliminary injunction. It is an extraordinary remedy, not available unless the plaintiff carries his burden of persuasion as to all of the four prerequisites. The primary justification for granting a preliminary injunction is to preserve the court's ability to render a meaningful decision after a trial on the merits.
 
 
 40
 It is often loosely stated that the purpose of a preliminary injunction is to preserve the status quo. See, e.g., Exhibitors Poster Exchange, Inc. v. National Screen Service Corp., 5 Cir. 1971, 441 F.2d 560; Miami Beach Federal Savings & Loan Association v. Callander, 5 Cir. 1958,256 F.2d 410. Indeed, some such notion may have influenced the district judge in this case, since he wrote of a 'status quo that would normally be entitled to temporary protection.' It must not be thought, however, that there is any particular magic in the phrase 'status quo.' The purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits. It often happens that this purpose is furthered by preservation of the status quo, but not always. If the currently existing status quo itself is causing one of the parties irreparable injury, it is necessary to alter the situation so as to prevent the injury, either by returning to the last uncontested status quo between the parties, Ross-Whitney Corp. v. Smith Kline & French Laboratories, 9 Cir. 1953, 207 F.2d 190, by the issuance of a mandatory injunction, see 7 Moore's Federal Practice P65.04(1), or by allowing the parties to take proposed action that the court finds will minimize the irreparable injury. The focus always must be on prevention of injury by a proper order, not merely on preservation of the status quo.
 
 
 41
 The parties have not made a major issue of the requirement that plaintiff demonstrate a substantial likelihood of prevailing on the merits, and the various court orders do not discuss the issue. However, it is important to consider this requirement, since, regardless of the balance of relative hardships threatened to the parties, the granting of a preliminary injunction would be inequitable if the plaintiff has no chance of success on the merits. The importance of this requirement varies with the relative balance of threatened hardships facing each of the parties.
 
 
 42
 Although a showing that plaintiff will be more severely prejudiced by a denial of the injunction than defendant would be by its grant does not remove the need to show some probability of winning on the merits, it does lower the standard that must be met. Conversely, if there is only slight evidence that plaintiff will be injured in the absence of interlocutory relief, the showing that he is likely to prevail on the merits is particularly important. Wright & Miller, Federal Practice and Procedure: Civil 2948. In this context, the district court should consider the relevance of Gulf Oil Corp. v. Morton, 9 Cir. 1973, 493 F.2d 141. Although the case arises in a different factual and legal context, it does indicate that temporary administrative action to meet previously unconsidered environmental dangers may be appropriate if it furthers the public policy expressed by Congress in the National Environmental Policy Act (NEPA), 42 U.S.C.A. 4321 et seq.,[3] even if it involves a temporary cessation of a project previously approved by Congress.
 
 
 43
 The district court must reconsider carefully the irreparability of the various injuries plaintiffs will allegedly suffer in the absence of a preliminary injunction. Many of the dangers, e.g., loss of recreational use of the lake, loss of tourism, and alteration of the lake ecology, can hardly be termed irreparable if, as alleged, they are fully reversible by the simple expedient of refilling the lake if the trial on the merits goes for plaintiffs.
 
 
 44
 Much has been made of the recommendations made by the United States Forest Service that the Ocklawaha be made a Study River for possible inclusion in the National Wild and Scenic River System[4] or be included within the Ocala National Forest. While these possibilities do highlight the sort of options that might be foreclosed if the river's ecology is destroyed, they are not the controlling considerations in themselves. The focus for purposes of a preliminary injunction must be on the irreparable injury presently threatened, rather than on the particular institutional mechanisms that might be set up to preserve the river in the long run.
 
 
 45
 Whatever may become of those proposals, the district court should focus directly on the primary purpose of a preliminary injunction in this context-- prevention of the irreparable injury itself.
 
 
 46
 Because of the relevance of the NEPA to suits such as this, it is important to note its impact on the preliminary injunction question. It is quite clear that the NEPA provides a new statutory basis for injunctions against proposed actions by federal agencies that will have significant effects on the human environment if no environmental impact statement has been filed. See, e.g., Sierra Club v. Volpe, N.D.Cal.1972,351 F.Supp. 1002; Environmental Defense Fund v. Tennessee Valley Authority, E.D.Tenn.1972, 339 F.Supp. 806, aff'd, 6 Cir. 1972, 468 F.2d 1164. However, the general requirements for a preliminary injunction, even in a suit grounded on the failure to file an impact statement, have not been altered. In many cases, preliminary injunctions have been granted, but only because the plaintiff, by showing no statement had been filed, had demonstrated a probability of success on the merits, and had further met the other usual requirements. In accordance with the traditional practice, preliminary injunctions have also been denied because the plaintiff has failed to prove one of the essentials, such as probability of success on the merits, Sierra Club v. Froehlke, W. D. Wis.1972, 345 F.Supp. 440, or threat of irreparable injury if the preliminary injunction is not granted, Environmental Defense Fund v. Hardin, D.D.C.1971, 325 F.Supp. 1401. Consequently, the NEPA, though relevant to the merits of the present case, has not altered the traditional tests for a preliminary injunction that are to be applied on remand.
 
 
 47
 It is true that defendants could have appealed from the original order of September 29, 1971, which granted the preliminary injunction, or any of the orders regarding subsequent motions to modify. Had they done so, no doubt a proper resolution of the preliminary injunction question would have been hastened. Their failure to file an earlier appeal, however, does not in itself give rise to any objection. If plaintiffs have established that the failure to take an earlier appeal is somehow relevant to one of the prerequisites for a preliminary injunction, the district court should give this factor appropriate consideration. Otherwise, the delay is irrelevant to the proper disposition of the present motion to modify. It should be remembered, also, that the decision not to appeal earlier may well have been induced by the district court itself, which specifically invited defendants to make further application to that court for 'vacative or modificatory' relief from the preliminary injunction.
 
 
 48
 There is no doubt that the district court has continuing jurisdiction over a preliminary injunction. See Central Hanover Bank & Trust Co. v. Callaway, 5 Cir. 1943, 135 F.2d 592. In the exercise of that jurisdiction, the court is authorized to make any changes in the injunction that are equitable in light of subsequent changes in the facts or the law, or for any other good reason. 7 Moore's Federal Practice P65.07. We regard the fact that all previous actions were taken under a mistaken view of the law as sufficiently good reason that the district court, upon a proper motion, should reconsider those actions in light of the correct standards.
 
 
 49
 Finally, we cannot avoid noting one disturbing possibility permeating this entire case. This preliminary injunction, unsupported by proper findings of fact and conclusions of law, has been in effect for well over a year, with only one interruption. As a result, the trees in Lake Ocklawaha have remained flooded, a condition which has contributed to their progressive deterioration. It is possible that the preliminary injunction, far from preventing the irreparable injury, has actually been causing it. We would regard this as a highly inequitable function for an equitable remedy. In view of this possibility, we would expect the district court to re-examine its order without delay.[5] Of course, no further evidentiary hearings should be held before this reexamination: it was the plaintiff's burden to introduce sufficient evidence to justify the preliminary injunction, and the court's prior action in refusing to modify it must stand or fall in light of the evidence before it at the time. Subsequent motions to modify the injunction might justify further evidentiary hearings if they allege changes in the facts. However, reconsideration of the motion presently under review should not be delayed by any further evidentiary hearings.
 
 
 50
 The case is remanded for new findings of fact and conclusions of law in accordance with the principles set out herein.
 
 
 51
 ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC
 
 PER CURIAM:
 
 52
 The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is denied.
 
 
 53
 In view of footnote five, which anticipates the possibility of a disposition on the merits without further action on the preliminary injunction, this appeal will not be dismissed as moot. Costs are taxed equally against the parties.
 
 
 
 [1]
 Statement by President Nixon, January 19, 1971
 
 
 [2]
 The full text of the President's statement of January 19, 1971, is as follows:
 I am today ordering a halt to further construction of the Cross Florida Barge Canal to prevent potentially serious environmental damages.
 The purpose of the Canal was to reduce transportation costs for barge shipping. It was conceived and designed at a time when the focus of Federal concern in such matters was still almost completely on maximizing economic return. In calculating that return, the destruction of natural, ecological values was not counted as a cost, nor was a credit allowed for actions preserving the environment.
 A natural treasure is involved in the case of the Barge Canal-- the Ocklawaha River-- a uniquely beautiful, semi-tropical stream, one of a very few of its kind in the United States, which would be destroyed by construction of the Canal.
 The Council on Environmental Quality has recommended to me that the project be halted, and I have accepted its advice. The Council has pointed out to me that the project could endanger the unique wildlife of the area and destroy this region of unusual and unique natural beauty.
 The total cost of the project if it were completed would be about $180 million. About $50 million has already been committed to construction. I am asking the Secretary of the Army to work with the Council on Environmental Quality in developing recommendations for the future of the area.
 The step I have taken today will prevent a past mistake from causing permanent damage. But more important, we must assure that in the future we take not only full but also timely account of the environmental impact of such projects-- so that instead of merely halting the damage, we prevent it.
 
 
 [3]
 The congressional declaration of national environmental policy is contained in 4331
 (a) The Congress, recognizing the profound impact of man's activity on the interrelations of all components of the natural environment, particularly the profound influences of population growth, high-density urbanization, industrial expansion, resource exploitation, and new and expanding technological advances and recognizing further the critical importance of restoring and maintaining environmental quality to the overall welfare and development of man, declares that it is the continuing policy of the Federal Government, in cooperation with State and local governments, and other concerned public and private organizations, to use all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans.
 (b) In order to carry out the policy set forth in this chapter, it is the continuing responsibility of the Federal Government to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may--
 (1) fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;
 (2) assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings;
 (3) attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences;
 (4) preserve important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity and variety of individual choice;
 (5) achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities; and
 (6) enhance the quality of renewable resources and approach the maximum attainable recycling of depletable resources.
 (c) The Congress recognizes that each person should enjoy a healthful environment and that each person has a responsibility to contribute to the preservation and enhancement of the environment.
 
 
 [4]
 The system was established by the Wild and Scenic Rivers Act, 16 U.S.C.A. 1271 et seq
 
 
 [5]
 At oral argument it was asserted that the trial on the merits had been completed. If a decision on the merits is to be immediately forthcoming, it will not be necessary for the district court to act further on the question of the preliminary injunction. If there is to be any delay in rendering the decision on the merits, however, the district court should first re-examine the motion to modify the preliminary injunction