Gail P. NOWLING, et al.

v.

**AERO SERVICES INTERNATIONAL, INC.**

Civ. A. No. 90–775.

United States District Court, E.D. Louisiana.

April 6, 1990.

Henry Dillon Murchison, Normand Francis Pizza and Sandra A. Vujnovich, Brook, Morial, Cassibry, Fraiche & Pizza, New Orleans, La., for plaintiffs.

Dando B. Cellini and Craig Lewis Caesar, McGlinchey, Stafford, Mintz, Cellini & Lang, P.C., Harry A. Rosenberg and Maria Nan Alessandra, Phelps, Dunbar, Marks, Claverie & Sims, Walter C. Thompson, Jr., Sessions, Fishman, Boisfontaine, Nathan, Winn, Butler & Barkley, New Orleans, La., Barry F. McNeil, Nina Cortell, Teresa J. Carson, Leonard A. Hirsch and George W. Bramblett, Jr., Haynes & Boone, Dallas, Tex., and Aubrey B. Hirsch, Jr., Locke, Purnell, Rain & Harrell, Ltd., New Orleans, La., for defendants and counter-claimants.

## ORDER AND REASONS

FELDMAN, District Judge.

After hearing testimony and reviewing the exhibits presented in this case, the Court ruled on several matters. The plaintiffs and counter-defendants, Ronald and Gail Nowling, reurged their Motion to Remand, and that motion is DENIED. Their Motion to Vacate and Set Aside Court Order is also DENIED. The defendants and counter-plaintiffs, Aero and Triton Energy Corp., have applied for a Preliminary Injunction (a temporary restraining order was previously entered), which is GRANTED as to Aero, and DENIED without prejudice as to Triton. This opinion is now given in support of the Court's announced rulings.

### I. Background

The Nowlings filed this suit in a Louisiana state court on February 28, 1990, seeking in part a declaration that the Louisiana Control Share Acquisition Act (LCSAA), La.R.S. 12:135–140.2, applies to the voting shares of Aero. Their suit was removed to this Court on March 2, 1990.

This dispute is a rather lengthy sequel to two earlier cases which were before this Court, *Triton Energy Corp. v. Dibo Attar*, C/A No. 88–3492, consolidated with *Trenk Devel. Corp. v. Aero Serv. Int'l, Inc.*, C/A No. 88–3624.[1] *Trenk* involved a hotly contested battle for corporate control of Aero in which Triton Energy, Trenk Development Company, and Robert Starer were competing suitors. *Trenk* was resolved when the parties agreed to a settlement after several days of trial. The undertakings of the parties and the findings of the Court were memorialized, first in the Findings of Fact and Stipulation of Conditional Dismissal, filed December 23, 1988, and later by the Findings of Fact and Stipulated Order of Dismissal dated May 22, 1989 (*Trenk* Orders). It is those orders which drive the present controversy. In the *Trenk* Orders, the Court found that "[t]he Louisiana Control Share Acquisition Act does not apply to Aero Services Inter-

---

1. These consolidated cases will be referred to as *"Trenk."*

national, Inc." [2] As part of the settlement of *Trenk* all the parties signed several agreements, among which were a Shareholders Agreement and a Standstill Agreement. Robert Starer, a director and then president of Aero, signed the agreements. He was a party in *Trenk* and is a counter-defendant here, although he is no longer Aero's president.

On August 7, 1989, Mr. Starer came once more before this Court with an application for a temporary restraining order to block Triton from purchasing Aero shares owned by Dibo Attar, another party in *Trenk;* he urged that the proposed purchase violated the *Trenk* Orders. Starer's temporary restraining order was denied, and on September 20, 1989 he dismissed his suit. But his interest in Aero did not falter.

In February 1990, a series of events occurred that culminated in this lawsuit: Mr. and Mrs. Nowling, who had been friends with Mr. Starer for several years (Mr. Nowling worked for Starer), met him for dinner on February 7th. On February 12th, Starer sent two letters to Aero's management about Aero's next shareholders meeting on March 29, 1990. One notified Aero of Starer's intention to present a resolution at the meeting scheduled for March 29th proposing that Aero be liquidated and that the LCSAA be implemented. The other raised objections to the draft of the proxy statement for the proposed meeting. On February 22nd, the Nowlings and Starer filed Schedule 13D forms with the Securities and Exchange Commission, ac-

knowledging that they might each be considered a member of a group with the other under the Securities Exchange Act of 1934 (the 1934 Act). The following day, February 23rd, Mr. Nowling sent out notices of a competing shareholders meeting that he had called for March 29, 1990, at 10:00 a.m., the same time management proposed to hold a meeting.[3] Then on February 28, 1990, the Nowlings filed their state court petition which gave birth to this dispute. Aero and Triton removed the suit to this Court.

## II. The Motion to Remand

At a hearing that resulted in the issuance of a temporary restraining order, this Court denied the Nowlings' Motion to Remand without prejudice to permit the submission of evidence on the remand issue at the hearing.

### A.

The Motion to Remand triggers inquiry into the Court's jurisdiction because it argues that there is no federal question pleaded on the face of the complaint, and, since Aero is incorporated in Louisiana, no other jurisdictional predicate for removal exists.[4] This Court nevertheless has jurisdiction over the subject matter of this case.

### 1.

 The familiar well-pleaded complaint rule requires that for a case to arise under federal law for purposes of jurisdiction, the federal claim must appear on the

---

**2.** For the LCSAA to apply, a corporation must be an "issuing public corporation." La.R.S. 12:136. The statute defines issuing public corporation as a corporation that has:

(a) One hundred or more shareholders;
(b) Its principal place of business, its principal office, or substantial assets, whether owned directly or through one or more wholly-owned subsidiaries, within Louisiana; and
(c) One or more of the following:
(i) More than ten percent of its shareholders reside in Louisiana.
(ii) More than ten percent of its shares owned by Louisiana residents.
(iii) Ten thousand shareholders reside in Louisiana.

La.R.S. 12:135(4). The issue, in *Trenk,* of the applicability of the LCSAA to Aero focused on Section 135(4)(b).

**3.** Nowling's meeting and Aero management's meeting were both scheduled to be held in New Orleans, but at different locations.

**4.** The removal statutes provide, in part:

Any civil action of which the district courts have original jurisdiction founded on a claim or right arising under the Constitution, treaties or laws of the United States shall be removable without regard to the citizenship or residence of the parties. Any other such action shall be removable only if none of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought.

28 U.S.C. § 1441(b).

face of the complaint. *Taylor v. Anderson*, 234 U.S. 74, 75–76, 34 S.Ct. 724, 724, 58 L.Ed. 1218 (1914). The Nowlings' state court petition facially seeks nothing more than a request for a Louisiana state court to declare that the LCSAA, a Louisiana statute, applies to Aero's voting shares. That declaration, however, could then entitle the Nowlings to injunctive relief to prevent Triton from exercising its franchise with respect to its Aero shares; it would also delay the shareholders meeting indefinitely. The Nowlings contend that they have assiduously avoided any allegations under the 1934 Act, and carefully drafted their state law claims to avoid stating a cause of action cognizable under federal law. Their complaint, however, attacks all stock transactions after June 1987. Thus, what the Nowlings really want is not the isolated ruling of a state court, but a repudiation of this Court's earlier *Trenk* Orders by a state court. Courts are no longer bound by a medieval acquiescence to the text of pleadings. A party may not evade removal by drafting a complaint so as to artfully disguise the true purpose of the lawsuit. *Villarreal v. Brown Express, Inc.*, 529 F.2d 1219, 1221 (5 Cir.1976); *See also Federated Dept. Stores, Inc. v. Moitie*, 452 U.S. 394, 101 S.Ct. 2424, 2427 n. 2, 69 L.Ed.2d 103 (1981). In fact, a purported state law claim that has sufficient federal character may be removed. *Id.* And a state law claim is said to have federal character when, as here, it calls into question a federal court order. *Sullivan v. First Affiliated Sec., Inc.*, 813 F.2d 1368, 1375–76 (9 Cir.) *cert. denied,* 484 U.S. 850, 108 S.Ct. 150, 98 L.Ed.2d 106 (1987). The case literature is properly sensitive of the need to insure the integrity of federal mandates.

*Moitie,* for example, permits removal of state claims filed to circumvent the preclusive impact of a federal order, even where the removal statutes would not. *Id.* at 1375–76.

The *Sullivan* court noted that "The res judicata impact of a federal judgment is a question of federal law which a state court is bound to apply under the Supremacy Clause." 813 F.2d at 1376. Thus, a state claim barred by the preclusive nature of a federal order can be characterized as an artfully pleaded federal claim if it seeks to escape the order. *Id.* "A purported state claim," *Sullivan* wisely counsels, "based on [the same operative] facts would be in effect the same federal claim against which the judgment had been entered. The removing court could thus recharacterize the state claim as an artfully pleaded federal claim filed to circumvent the res judicata effect of the federal judgment." *Id.*

Although the petition filed by the Nowlings in state court purports to seek a declaratory judgment under state law only, its actual function is to avoid and attack the *Trenk* Orders. It cannot be looked upon as only innocently raising state law issues. The Nowlings claim that their state court suit was not an effort to trump the *Trenk* Orders, but only a wish to test the applicability of the LCSAA to Triton's purchase of Aero stock in August 1989. To believe that would be to substitute naivete' for common sense. Their state court petition betrays their argument by challenging all purchases going back to June 11, 1987.[5] Consequently, this case is no more than an attempt to collaterally attack the *Trenk* Orders, and is possessed of the very kind of federal character sufficient to support removal.

### 2.

■ Even if the Nowlings' claims could not be said to possess the imperative federal character, the removal statutes still would not be the exclusive sources of removal jurisdiction. *Yonkers Racing Corp. v. City of Yonkers*, 858 F.2d 855, 863 (2 Cir.1988), *cert. denied,* —— U.S. ——, 109

---

5. When this fact was noted by the Court, the Nowlings asked that their complaint be conveniently amended so as to restrict it to a challenge of Triton's August 1989 purchase of Aero stock. The amendment does not require a remand. *Carnegie–Mellon Univ. v. Cohill,* 484 U.S.

343, 108 S.Ct. 614, 622, 98 L.Ed.2d 720 (1988); *Camejo v. Ocean Drilling & Exploration,* 838 F.2d 1374, 1377 n. 8 (5 Cir.1988). The Nowlings must live with their complaint as filed; their attempted amendment was but a cynical exercise to tailor some facts to fit their arguments.

S.Ct. 1527, 103 L.Ed.2d 833 (1989). Other statutes vest federal courts with the authority to exercise jurisdiction, in exceptional circumstances, to protect an order issued in an earlier case. *Id.* Thus, for example, the All Writs Act, 28 U.S.C. § 1651(a), authorizes federal courts to issue orders to someone not party to an earlier action if it is necessary to avoid frustrating the implementation of the orders issued in the earlier case. *Id.* This Court, then, has the command to exercise its jurisdiction to avoid the real possibility of orders issuing from a state court that would be inconsistent with its own. *Id.* That kind of institutional prerogative has also been confirmed in a suit to enjoin a state court action under an exception to the Anti–Injunction Act, 28 U.S.C. § 2283. *Southwest Airlines Co. v. Texas Int'l Airlines, Inc.*, 546 F.2d 84, 89–90 (5 Cir.) *cert. denied*, 434 U.S. 832, 98 S.Ct. 117, 54 L.Ed.2d 93 (1977). *Southwest Airlines* strengthens this Court's power to insure that its orders are not obstructed, even if the Nowlings' efforts lacked federal character.

### B.

■ The Nowlings protest that because they were not parties in *Trenk*, the *Trenk* Orders cannot have preclusive effect in this suit. In *Southwest Airlines*, the Fifth Circuit followed the repeated recognition by federal courts that judgments can bind persons not parties to the original litigation. 546 F.2d at 95. Although common law required privity for those persons to be bound, *Southwest Airlines* teaches that federal courts have looked to relationships that were "sufficiently close" to justify preclusion. *Id.* That seems something less than the formalism of privity. If the relationship is too removed, due process provides a shield for non-parties. *Id.* In this case, the Nowling–Starer synergy is pivotal.

The relationship of the Nowlings with Robert Starer, a key party in *Trenk*, is more than sufficiently close for the *Trenk* Orders to have preclusive effect here. Their conduct at times is overwhelmingly identical. To repeat, Mr. and Mrs. Nowling and Mr. Starer had dinner together the evening of February 7, 1990. Starer claims he just happened to call them from an airport. It was then that Starer says he first learned of the Nowlings' ownership of their Aero common stock. According to the testimony of both Nowling and Starer, their dinner discussion of Aero stock was limited to this single revelation. Subsequent events are too coincidental to believe they were fortuitous. On February 12, 1990, Starer sent a letter to Aero's General Counsel outlining his dissatisfaction with the draft of Aero's proxy statement for the anticipated March 29th shareholders meeting. On the same day, February 12th, in still another letter to the General Counsel, Starer outlined proposals that he wanted to raise at the March meeting; proposals which thereafter became the focus of the Nowlings' suit. The proposals dealt with the liquidation of Aero, and the applicability of LCSAA. On February 22, 1990, both Nowling and Starer filed Schedule 13D forms with the Securities and Exchange Commission, each acknowledging that he "may be considered a member of a group" with the other under the 1934 Act. The Schedule 13Ds were prepared by the same lawyer. They revealed that the Nowlings and Starer were all interested in a liquidation of Aero, and in having the LCSAA applied to Aero. On February 23, 1990, Mr. Nowling mailed notices to shareholders of a meeting he planned to unilaterally hold on March 29th (on the same day and at the same time as the meeting that Aero planned, but at a different location). The copy of Nowling's notice that was sent to Aero's General Counsel came with a cover letter from the same law firm that had prepared the SEC filings for the Nowlings and Starer. The agenda for Nowling's proposed meeting is strikingly similar to Starer's suggested proposals for the Aero proxy statement. To underscore, both wanted a liquidation of the company, and a consideration of the application of the LCSAA to Aero. Shortly thereafter, on February 28, 1990, the Nowlings filed this suit in state court. And yet the Nowlings and Starer insist the one didn't know what the other was doing. On March 2, 1990,

Mr. Nowling's counsel in New Orleans requested a stockholder list from Aero. Aero denied the request on March 7, 1990, because the Nowlings did not own enough stock to make the request. On March 7th, the same day that Nowling's request was denied, Starer also requested a stockholder list. Again, on March 7th, the press somehow caught wind of the 13D filings and some newspapers ran stories reporting that Aero's liquidation was being proposed.

■ The Court simply cannot ignore the overwhelming parallels in this chronology. This sequence of events, viewed against the added fact that Starer is financing the litigation for the Nowlings, just cannot be explained away as a mere parade of coincidences. The only conclusion that does not strain reality is that there were cooperative efforts between the Nowlings and Starer from the outset in the calling of the other shareholders meeting, seeking liquidation and avoiding the reach of LCSAA, and the filing of this lawsuit. That concerted action establishes the necessary relationship with Starer in *Trenk* sufficient to bring the Nowlings within the reach of the *Trenk* Orders.[6] Their plans with Starer are crudely obvious.

### C.

■ The Nowlings insist that federalism principles require the remand of this case. That argument weighs heavily on this Court. Once more, however, the theme of *Southwest Airlines* threads its way through this analysis. In *Southwest Air-*

*lines* the Fifth Circuit addressed a serious federalism question and found that Congress had crafted an unqualified exception to the Anti–Injunction Act that allows federal courts to issue injunctions "to protect or effectuate ... judgments" of the federal judiciary. *Southwest Airlines Co. v. Texas Int'l Airlines, Inc.*, 546 F.2d at 91. Because the serious implication of federalism is raised, it is important to pause on it here. The *Southwest Airlines* court concluded that an injunction to protect a federal order preserved rather than offended notions of federalism. *Id.* at 93. *Southwest Airlines* reflects the Court's beliefs. The *Trenk* Orders, announced by this Court in complete harmony with principles of federalism, fall squarely within that class of federal court orders contemplated by the *Southwest Airlines* court, and are worthy of protection. Therefore, this Court has jurisdiction over the subject matter of this case.

### III. To Set Aside the *Trenk* Orders

The Nowlings also ask the Court to set aside the *Trenk* Orders under Rule 60(b) of the Federal Rules of Civil Procedure.[7] They argue that, in *Trenk*, Aero misrepresented two essentials to the Court: the location of Aero's principal office, and whether Aero had substantial assets located in Louisiana. Both considerations would alter the conclusion that the LCSAA did not apply to Aero. They also add that equity demands that the *Trenk* Orders be vacated or set aside. But the central question is whether some fraud, misrepresenta-

---

**6.** Although it is not necessary to reach the question whether Mr. Nowling was in privity with Aero because of his employment or his status as a shareholder, the requirements for a positive holding on this issue are satisfied. Nowling received constructive notice of the *Trenk* Orders as an Aero employee by the Starer memorandum circulated to all Aero employees on February 8, 1989. He received constructive notice as a shareholder from the Notice to Shareholders dated December 20, 1988 and distributed in accordance with the Court's Order of December 19, 1988. Finally, Nowling acknowledged that he had heard rumors of *Trenk* around the time that he acquired his common stock in December 1988. In *Trenk*, which were class action derivative suits, the Nowlings' interests were adequately represented by the corporation and its board.

*Amalgamated Sugar Co. v. N.L. Industries, Inc.*, 825 F.2d 634, 640–41 (2 Cir.) *cert. denied sub nom., Rothenberg v. Amalgamated Sugar Co.*, 484 U.S. 992, 108 S.Ct. 511, 98 L.Ed.2d 511 (1987).

**7.** Rule 60(b) reads in part:

On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: ... (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; ... or, (6) any other reason justifying relief from the operation of the judgment.

Fed.R.Civ.P. 60(b).

tion, or misconduct has been proved. Plaintiffs' burden is a heavy one.

## A.

■ Under Rule 60(b)(3) plaintiffs must meet their burden by clear and convincing evidence. *Saenz v. Kennedy*, 178 F.2d 417, 419 (5 Cir.1949). Their motion should be denied if it is merely an attempt to relitigate an old issue. *Mastini v. American Tel. & Tel. Co.*, 369 F.2d 378, 379 (2 Cir. 1966), *cert. denied*, 387 U.S. 933, 87 S.Ct. 2055, 18 L.Ed.2d 994. Furthermore, the Nowlings must establish that the misconduct at issue prevented a full and fair consideration of the case by the Court. *Taylor v. Texgas Corp.*, 831 F.2d 255, 259 (11 Cir.1987). (Rule 60(b)(6) is a residual clause that grants courts considerable equitable power to accomplish justice. *Seven Elves, Inc. v. Eskenazi*, 635 F.2d 396, 401–02 (5 Cir.1981). But the evidence presented clearly sought to address improper conduct under Rule 60(b)(3)).

The Nowlings argue that the affidavit of Roberta Romberg, Aero's General Counsel, which she submitted in *Trenk*, failed to disclose that Aero's by-laws named New Orleans as Aero's principal office, and that her affidavit only quantified the extent of Aero's assets in Louisiana as a percentage of the whole. That assertion misses the point.

■ The combat in *Trenk* was without mercy, including three days of trial prior to the settlement. No issue went unexamined or unchallenged. The by-laws were made a part of the documents on which the Findings of Fact and Stipulation of Conditional Dismissal were based. Starer signed the papers, and was president of Aero at the time. Starer knew of the statement in the by-laws; he also knew that, in fact, the company's principal office was in Newtown, Pennsylvania, not New Orleans, in a building he owned and rented to Aero. At the worst, Ms. Romberg overlooked a statement which had been in the by-laws since approximately 1950 and which had been ignored in practice for years. The cases are clear. If the movant or his privy had knowledge of allegedly withheld informa-

tion at the time the questioned order was entered, and had full opportunity to litigate the issue, he cannot challenge the outcome under Rule 60(b)(3). *Taylor*, 831 F.2d at 259–60; *see Bulloch v. United States*, 721 F.2d 713 (10 Cir.1983) (where all information, data and witnesses available to all parties in prior action, one party cannot later claim fraud on the court for relief from judgment), *cert. denied*, 474 U.S. 1086, 106 S.Ct. 862, 88 L.Ed.2d 900 (1986). Starer's knowledge was beyond challenge. Thus, the fact that Ms. Romberg failed to mention the statement in the by-laws does not compel relief from the *Trenk* Orders on this record. Her omission has been proved to be nothing more than an oversight or mistake; it is not unlike harmless error in the world of appeals.

The Nowlings' point that the concept of "substantial assets" as used in the statute should be considered in an absolute rather than in a relative sense is without support in the case law. Furthermore, Ms. Romberg's affidavit particularizes the nature of the assets located in Louisiana—a fixed base operation at the Lakefront Airport, and a bank account at the Whitney National Bank. In describing Aero's Louisiana-based assets as a percentage of the company's total assets, Ms. Romberg did not misrepresent the extent of those assets.

## B.

■ The Nowlings have failed to meet their heavy burden. They have not established by clear and convincing evidence that the omissions, if any, in the Romberg affidavit reach the level of fraud, misrepresentation or misconduct as a cause for vacating an order under Rule 60(b)(3). *See Taylor*, 831 F.2d at 259–60. Neither the Nowlings, and particularly not their compatriot, Mr. Starer, were prevented from fully presenting their case in *Trenk*, (most particularly, Mr. Starer, who boasted to Aero personnel that he led the defense in *Trenk*). Furthermore, equity does not demand that the *Trenk* Orders be vacated. All parties to *Trenk* agreed to the *Trenk* Orders, and nothing has been presented to

this Court to contradict its earlier findings that the LCSAA does not apply to Aero.[8]

## IV. The Injunction

In response to the Nowlings' suit and Starer's remarkably coextensive conduct, Aero and Triton apply for a preliminary injunction to stop the Nowlings and Starer from revisiting the issue of the applicability of the LCSAA to Aero, and from holding their own March 29th shareholders meeting. It is now academic that entitlement to a preliminary injunction requires the seeker to show (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm; (3) that the threatened injury outweighs the harm that the nonmoving party would suffer if the injunction were granted; and (4) that granting the injunction will not disserve the public interest. *Canal Authority of the State of Florida v. Callaway*, 489 F.2d 567, 572 (5 Cir.1974). It is to the task dictated by *Callaway* that the Court now turns. Whether injunctive relief should be granted is within the Court's sound discretion. *Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5 Cir.1985). The four tests of *Callaway* command here that a preliminary injunction must issue.

A.

 A preliminary injunction may issue if the movant demonstrates a substantial likelihood of success on the merits, even if a plausible defense is presented. *Dallas Cowboy Cheerleaders, Inc. v. Scoreboard Posters, Inc.*, 600 F.2d 1184, 1188 (5 Cir.1979). Thus, this Court has the power to enjoin an improperly noticed shareholder meeting. *Hebert v. Stansbury*, 351 So.2d 253, 255 (La.App.1977), *cert. denied*, 353 So.2d 1335 (La.1978); *Bryan v. Western Pac. R. Corp.*, 28 Del.Ch. 13, 35 A.2d 909 (1944). Also, if there has been a possible violation of Section 14(a) of the 1934 Act, injunctive relief is appropriate. *See, e.g., Metro Mobile CTS, Inc. v. Centel Corp.*, 694 F.Supp. 806 (D.Kan.1988).

 The Louisiana Business Corporation Law (LBCL) requires that an annual shareholders meeting shall be held for the purpose of electing directors. La.R.S. 12:73 A. If no annual meeting is called for eighteen months, any shareholder may call a meeting. La.R.S. 12:73 A. Aero's by-laws require that an annual meeting be held on the third Monday of February. The by-laws further provide that if the annual meeting is missed, a special meeting must be called. The LBCL makes clear that only the President or the Board may

---

**8.** The Court need not relitigate the issue of the applicability of the LCSAA to Aero. Evidence taken at the hearing of this matter has only served to reinforce this Court's conclusions in *Trenk*.

A building owned by Starer in Newtown, Pennsylvania, was the principal office of Aero at the time of *Trenk* and before. Aero simply did not operate as its by-laws stated. Corporate by-laws may be amended by implication by virtue of the conduct of those authorized to change them, if the course of conduct has continued long enough that the stockholders had knowledge of the changes and consented to them. *In re Osteopathic Hosp. Ass'n*, 41 Del.Ch. 369, 195 A.2d 759, 762 (1963); *In re Ivey & Ellington*, 28 Del.Ch. 298, 42 A.2d 508, 509–10 (1945). The conclusion that the by-laws had been so amended is confirmed by the actions of the Nowlings and Starer. Not one important piece of paper which was generated by the Nowlings or Starer during the February–March window of events was sent anywhere for Aero's attention except to Newtown. In fact, Starer moved the principal office to Newtown and hired Nowling from that

address during Starer's tenure as president of Aero. In addition, the term "principal office" is not considered to be a term of art. *See Alabama ex rel Graddick v. TVA*, 636 F.2d 1061 (5 Cir.), *cert. denied*, 454 U.S. 837, 102 S.Ct. 142, 70 L.Ed.2d 118 (1981).

The Court also reaffirms that Aero does not have substantial assets in Louisiana within the meaning of the LCSAA, nor did it when the *Trenk* Orders were announced. Ms. Romberg testified, without challenge, that the average balance for the bank account at the Whitney National Bank in 1988 was negative, and that the facility at the Lakefront Airport was not particularly large compared to Aero's other operations. Finally, the fact remains that considerably less than ten percent of Aero's assets were located in Louisiana. The Nowlings' suggestion that the determination of substantial assets should have been made in an absolute rather than a relative sense is without support, and the Court is satisfied that assets well below ten percent of the total failed to reach the level of substantial assets.

call a special meeting. La.R.S. 12:73 B. So does the state case literature. In *Phillips v. Newland*, 166 So.2d 357 (La.App.), *cert. denied*, 246 La. 872, 167 So.2d 679 (1964), the court held that where the company's articles called for an annual meeting to be held every August 8th, a shareholders meeting called for September 10th was a special meeting. *Id.* at 361. If a special meeting is called, notice of the meeting must be given to all shareholders eligible to vote at the meeting. La.R.S. 12:73 D. Since Aero's by-laws call for an annual meeting on the third Monday of each February, a meeting called for March 29, 1990, is, juridically, a special meeting. The Nowling meeting was not called by the President or the Board of Aero, and no shareholder list as of the record date for the meeting was available to Nowling for his use in mailing; there is therefore a substantial likelihood that the Nowling meeting could be illegal under the LBCL. Aero invokes still another disability.

■ Section 14(a) of the Securities Exchange Act of 1934 prohibits use of the mails to solicit proxies in contravention of the rules and regulations of the Securities and Exchange Commission. 15 U.S.C. § 78n(a). The Nowling notice sent to shareholders could be a solicitation, as that term has been broadly construed. *See Long Island Lighting Co. v. Barbash*, 779 F.2d 793 (2 Cir.1985). *Barbash* teaches that "communications to security holders under circumstances reasonably calculated to result in the procurement, *withholding* or revocation of a proxy" will be treated as a solicitation. *Id.* at 796 (emphasis added). Sending a notice of a competing meeting called for the precise time and date of Aero's proposed meeting certainly appears functionally calculated to withhold proxies from that meeting. Since the notice looks like and could be a solicitation, it would not comply with Rule 14a–3 of the 1934 Act because the notice admittedly was not preceded by a proxy statement containing the information called for in Schedule 14A.

There is, then, a substantial likelihood that at least Aero will succeed on the merits of this case: the Nowling rump meeting and the hurry-up notice appear not to comply with either Louisiana law or the 1934 Act; the LCSAA does not apply to Aero, as held in *Trenk;* the Nowlings and Mr. Starer are related enough with one another to bring the Nowlings within the reach of the *Trenk* Orders [9]; and the conduct of the Nowlings and Mr. Starer, particularly the filing of the Schedule 13Ds, violates paragraph 3(d) of the Standstill Agreement of December 16, 1988.[10]

### B.

■ Aero would easily suffer irreparable harm if the Nowlings' proposed meeting is allowed to proceed. The record establishes, by a preponderance of the evidence, that parallel shareholder meetings on the same day at different places would indeed create a great deal of confusion, fear, and uncertainty not only for the shareholders, but also for Aero's employees and suppliers.[11] Confusion as to who is the lawful company management and board would taint every transaction attempted by the legitimate board, one or the other. Furthermore, it is the expressed intention of the Nowlings and Starer to liquidate the company. If the Nowlings'

9. Success on the merits depends in large measure on the ability of Aero to connect the Nowlings and Starer. That is a pivotal issue in this case. This Court believes that the inferences to be drawn from the evidence of the activity that took place in February and early March 1990, proximate to the dinner meeting between the Nowlings and Mr. Starer on February 7, 1990, and from the fact that Mr. Starer, though not a named party in the state court petition, is financing this litigation on behalf of the Nowlings, compel a finding in Aero's favor by a preponderance of the evidence, as discussed more fully in Section II Part B of this opinion.

10. The Standstill Agreement is a part of the Findings of Fact and Stipulation of Conditional Dismissal, dated December 23, 1988 in *Trenk.* It, like all other *Trenk* papers, was approved and signed by Starer.

11. Indeed, Mr. Starer's cavalier suggestion that there could be two simultaneous meetings linked by telephone, or by some busing arrangement, betrays his denial of chaos and confusion.

meeting proceeds and a Nowling–Starer board is elected, any agreements it made to liquidate the company could realistically cause Aero to lose its employees and suppliers (and Aero would be embroiled in years of litigation about what has been attempted). If the Nowling meeting proceeds it could also result in a transfer of ownership of shares based on the belief that the board elected at the meeting represented (or did not represent) the legitimate management of Aero. Much of this kind of mischief could never be undone.

At least one other district court has reached the same result in similar circumstances. *See Metro Mobile CTS, Inc. v. Centel Corp.*, 694 F.Supp. at 808. In *Metro Mobile*, the court emphasized that "[w]hile defendant is correct in asserting that plaintiffs would have a right to a new election if [the challenged] election were later determined to be invalid, plaintiffs are correct in pointing out that this court would not be able to reverse all actions taken by the Board in the meantime which might adversely affect the value of plaintiff's stock." *Id.*

### C.

The Court has already indicated the potential for irreparable harm to Aero, if the call of the Nowling meeting is ignored by this Court. On the other hand, any harm to the Nowlings caused by granting the preliminary injunction would be insignificant at most. If the Aero meeting proceeds, after proper dissemination of proxy materials, the Nowlings and Starer will be able to exercise their franchise on the same day and at the same time as they would if their meeting were to occur. Quite clearly, the harm to Aero is greater than any arguable harm to the Nowlings if the injunction is not granted.

### D.

No harm to the public interest is implicated if the preliminary injunction is granted. Rather, if the public interest is implicated at all, it tilts in favor of issuing the preliminary injunction to protect the job security of Aero's employees and to recognize that Aero's suppliers must know whether and with whom they can do business at Aero.

### V.

■ The Nowlings claim that Triton has used the *Trenk* Orders to amass control of Aero [12] and thus to block a proposed sale of Aero. They contend that Triton's unclean hands should not be rewarded. This claim, which does not spill over to Aero, nevertheless is of concern to the Court.

■ The Clean Hands doctrine requires a showing of conduct contrary to the dictates of good conscience or fair dealing, and refers to willful misconduct. *Dahl v. Pinter*, 787 F.2d 985, 988 (5 Cir.1986), *vacated on other grounds*, 486 U.S. 622, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988). The challenged conduct must be intentional, and morally bad under the circumstances. *Id.* The doctrine further requires some nexus between the alleged misconduct and the activity sought to be enjoined. *Shondel v. McDermott*, 775 F.2d 859, 869 (7 Cir.1985).

The Nowlings point to Triton's decision not to accept an offer to buy Aero, and the measures Triton allegedly took to block the proposed sale, as a violation of the Shareholders Agreement. Triton claims that its decision was prompted by business concerns, and did not violate the Shareholders Agreement.[13] In either event, this issue is

---

**12.** Whether Triton has control of Aero is an issue that has not been resolved. This Court did deny Starer's application for a temporary restraining order seeking to block Triton's acquisition of Aero shares in August 1989, ruling that it appeared that Triton's actions in that transaction had conformed with the *Trenk* Orders, in the context of a temporary restraining order; Starer did not pursue that litigation.

**13.** Paragraph 8.7 of the Shareholders Agreement reads:

> *Sale of Aero.* The parties hereby covenant and agree to use their best efforts to take any and all action necessary to proceed in connection with a proposed acquisition of AERO, of all the AERO Stock or any merger or other business combination involving AERO.

totally unrelated to Aero's application to enjoin an illegal shareholders meeting. Proof of Triton's bad conduct has been of concern to the Court but, thus far, is merely speculative.

### VI.

Therefore, the Motion to Remand, reurged by the Nowlings, is DENIED; the Nowlings' Motion to Vacate and Set Aside Court Order is DENIED; and the Application for Preliminary Injunction is GRANTED as to Aero, and DENIED without prejudice as to Triton.[14]

The Nowlings and Mr. Starer contend that Triton breached this covenant by causing its representatives on Aero's Board to vote against a proposed merger of Aero, and by threatening to vote its shares against a sale of Aero's assets. Triton allegedly represented to the members of Aero's Board that a super-majority of two-thirds of the voting shares was needed to approve such a sale, when, according to the Nowlings and Mr. Starer, only a simple majority was required to approve the sale.

Triton counters that it did not breach the Shareholders Agreement. It contends that the covenant in paragraph 8.7 only requires Triton to exert its best efforts in effecting a sale of Aero, and that Triton is not bound by that provision to vote for any and all offers that arise. The evidence on these issues was at best inconclusive.

14. While the record does not support a finding of unclean hands, the Court is concerned enough about the conduct of Triton to deny Triton's request for a preliminary injunction without prejudice.